**JOHN'S HEATING SERVICE,**
Appellant/Cross–Appellee,

v.

**Michael A. LAMB and Cynthia E. Johnson–Lamb, Appellees/Cross–Appellants.**

Nos. S–9042, S–9052.

Supreme Court of Alaska.

May 10, 2002.

Michael D. Corey, Sandberg, Wuestenfeld & Corey, Anchorage, for Appellant.

Sarah J. Tugman, Anchorage, for Appellees.

Before: MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

Michael and Cynthia Lamb sued John's Heating Service claiming that John's Heating negligently failed to repair their furnace or to warn the Lambs of its dangerous condition. John's Heating raised a statute of limitations defense that the trial court precluded in a summary judgment order. The trial court also rejected John's Heating's pretrial challenge to the admissibility of the testimony of several of the Lambs' medical experts. After trial, the jury returned a verdict against John's Heating, reduced by the comparative negligence of the Lambs. John's Heating appeals the grant of summary judgment on its statute of limitations defense, the admission of expert testimony, jury instructions on negligence, the denial of summary judgment on causation of Michael Lamb's retirement, the grant of prejudgment interest on future economic damages, and the validity of a joint offer of judgment. The Lambs cross-appeal the jury instruction on comparative negligence, cross-appeal the admission of evidence of Michael Lamb's disability retirement, and claim inconsistency in the verdict. Because a disputed issue of fact exists as to when the statute of limitations began to run, we reverse the grant of summary judgment and remand that issue to the superior court for further proceedings. Because our law does not allow prejudgment interest on future damages, we strike that award. On the issue of whether an unapportioned joint offer by joint offerors is valid to invoke the enhanced interest penalty provisions of Alaska Civil Rule 68, we conclude that such an offer was valid in this case. On all of the numerous other issues on appeal and cross-appeal, we affirm.

## II. FACTS AND PROCEEDINGS

### A. Facts

In August 1991 Michael and Cynthia Lamb bought and moved into a problem-plagued house[1] in Kodiak. On October 15 they called John's Heating to check on their furnace. John's Heating sent an employee, Tim Galloway, to investigate the problem.

The Lambs alleged that they told Galloway that their furnace was not functioning properly, that the furnace seemed to be circulating soot throughout their home, and that they were concerned by the persistent smell of fuel in the house. As evidence of the problem, Cynthia showed Galloway "Bounce" fabric softener sheets that she had been inserting in the floor vents to filter out soot and grime that she suspected the furnace was circulating throughout the house. The

---

1. We reviewed previous litigation brought by the Lambs against other defendants regarding this house in *Brigdon v. Lamb*, 929 P.2d 1274 (Alaska 1997).

Lambs claimed that Galloway did not think the soot-filtering Bounce sheets were a sign of furnace trouble and that he told Cynthia she needed to do a better job of cleaning the house.

John's Heating disputed the Lambs' version of the facts. John's Heating claimed that the Lambs informed neither Galloway nor the employee that answered the Lambs' telephonic request for service that they suspected the furnace was circulating flue gases or other combustion byproducts into the living space. Neither of the business records relating to the Lambs' service call showed that John's Heating was informed of, or suspected, a more serious furnace problem.

Both parties agreed that all Galloway did was level the fuel tank and relight the furnace.

The Lambs began to suffer physical effects from what they later alleged was carbon monoxide poisoning caused by their furnace. Both said that they started to feel tired and confused, and that they lacked concentration and memory.

The Lambs continued to live in the house and to use the furnace until January 31, 1993. At that time, they called Jerry Cloudy at Chase Plumbing, another furnace repair and heating business in Kodiak, to inspect their furnace. Cloudy informed the Lambs that their furnace was probably circulating carbon monoxide and other flue gases throughout their home and advised them not to use it while they were home until they could get it replaced. The Lambs had the furnace replaced six days later. However, they continued to suffer residual physical and neurological problems that they attributed to long-term, low-level carbon monoxide exposure[2] from their malfunctioning furnace.

### B. Proceedings

The Lambs filed suit against a number of defendants, including John's Heating, on December 23, 1993. John's Heating asserted the statute of limitations as an affirmative defense. John's Heating also moved for summary judgment on the statute of limita-

tions issue, claiming that its only contact with the Lambs was on October 15, 1991, and that the Lambs did not file suit until December 23, 1993, more than two years later. The trial court denied John's Heating's motion for summary judgment and granted the Lambs' cross-motion for summary judgment without explanation, precluding John's Heating from asserting a statute of limitations defense at trial.

John's Heating also tried to preclude the testimony of the Lambs' medical experts regarding chronic carbon monoxide exposure. However, the court denied John's Heating's motion, concluding that "[i]n the case of carbon monoxide exposure, the scientific community has not yet been able to conclusively measure specific neurocognitive damages in relation to specific amounts of exposure. Lack of specific information, however, cannot permit defendant to shield itself from liability. This issue is for a jury to decide." The superior court allowed the Lambs' experts to testify.

After a week-long trial in July 1998, the jury rendered a verdict for the Lambs. The jury awarded $810,000 in damages for Michael Lamb and $815,000 in damages for Cynthia Lamb. Each award was composed of both past and future damages. However, the jury also reduced the awards because it found that both Lambs were comparatively negligent in continuing to operate the furnace even though they knew or should have known that it was dangerous and that it was injuring them. The jury found Michael forty-five percent at fault for his injuries and found Cynthia forty percent at fault for her injuries. The verdict was accordingly reduced by those percentages.

After the jury returned its verdict, the Lambs submitted a proposed order of final judgment containing interest calculations and attorney's fees awards. The court adopted the Lambs' proposed order, which applied an enhanced interest rate of 15.5% for its computation of the prejudgment interest on the jury's award. The court ordered enhanced prejudgment interest because John's Heating had not accepted the Lambs' pretrial joint

---

**2.** We will refer to long-term, low-level carbon monoxide exposure with the shorthand terms "chronic carbon monoxide exposure" or "chronic exposure."

offer of judgment in the amount of $750,000, inclusive of interest, costs, and attorney's fees.

John's Heating appeals on six issues: (1) whether the superior court erred in granting summary judgment in favor of the Lambs on the statute of limitations issue; (2) whether the Lambs' expert testimony on chronic carbon monoxide exposure should have been inadmissible; (3) whether the jury instructions on negligence were in error; (4) whether the superior court erred in failing to grant summary judgment that Michael Lamb's Coast Guard retirement was due to his back injury and not chronic carbon monoxide exposure; (5) whether prejudgment interest on future economic damages that are discounted to the time of trial is an impermissible double recovery; and (6) whether the Lambs' joint offer of judgment was invalid to trigger the Civil Rule 68 prejudgment interest penalty. The Lambs cross-appeal on three issues: (1) whether the court erred by giving a jury instruction on comparative negligence; (2) whether admitting evidence of Michael Lamb's disability retirement violated the collateral source rule; and (3) whether the jury rendered an inconsistent verdict by failing to award Michael Lamb past economic damages.

## III. STANDARD OF REVIEW

■ We review a trial court's order granting summary judgment de novo.[3] We draw all reasonable factual inferences in favor of the non-moving party.[4] By our review, we seek "to determine whether genuine issues of material fact exist and whether the moving party is entitled to judgment as a matter of law." [5]

■ We review the trial court's admission of expert scientific evidence for an abuse of discretion.[6]

■ We review whether a jury instruction is appropriately "tailored to the case at hand" under the abuse of discretion standard.[7] Whether a jury instruction properly instructs on the law, however, is reviewed de novo.[8]

■ Finally, questions of law are reviewed de novo.[9]

## IV. DISCUSSION

### A. Summary Judgment Was Not Appropriate Because the Date that the Lambs Reasonably Should Have Discovered that They Were Being Exposed to Carbon Monoxide Due to John's Heating Negligence Is a Disputed Factual Issue.

John's Heating argues that summary judgment was improperly granted on the statute of limitations issue. John's Heating notes that whether the Lambs had sufficient information to prompt reasonable people to conduct an inquiry to protect their rights was in dispute when the trial court granted summary judgment. The Lambs counter by arguing that as a matter of law the statute of limitations did not begin to run "until the Lambs had reason to believe not only that the furnace was operating poorly but also to suspect that they were injured and that it had injured them." The Lambs conclude that the date on which their cause of action accrued was therefore January 31, 1993, when Jerry Cloudy of Chase Plumbing told them the furnace was probably malfunctioning. The superior court apparently agreed with the Lambs since it granted summary judgment in their favor on this issue.

Alaska Statute 09.10.070(a) states that "[e]xcept as otherwise provided by law, a person may not bring an action . . . for personal injury or death . . . unless the action is

---

3. *United Airlines, Inc. v. Good Taste, Inc.,* 982 P.2d 1259, 1262 (Alaska 1999) (citing *West v. City of St. Paul,* 936 P.2d 136, 138 (Alaska 1997)).

4. *Id.*

5. *Id.*

6. *State v. Coon,* 974 P.2d 386, 398 (Alaska 1999).

7. *Power Constructors, Inc. v. Taylor & Hintze,* 960 P.2d 20, 29 (Alaska 1998).

8. *Id.*

9. *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

commenced within two years of the accrual of the cause of action." [10]

■ The date on which the statute of limitations begins to run is a factual question.[11] Because the question is fact dependent, summary judgment ordinarily should not be used to resolve when a statute of limitations commences.[12] Only in the unusual circumstance in which "there exist uncontroverted facts that determine when a reasonable person should have been on inquiry notice" can a court properly resolve the question as a matter of law.[13] Accordingly, we must determine whether the superior court had before it uncontroverted facts sufficient to support its entry of summary judgment.

1. **The discovery rule provides the legal test as to when the statute of limitations began to run on the Lambs' negligence claim.**

■ Where an element of a cause of action is not immediately apparent,[14] the discovery rule provides the test for the date on which the statute of limitations begins to run.[15] As we have explained,

the statute of limitations does not begin to run until the claimant discovers, or reasonably should have discovered, the existence of all elements essential to the cause of action. Thus we have said the relevant

inquiry is the date when the claimant reasonably should have known of the facts supporting her cause of action. We look to the date when a reasonable person has enough information to alert that person that he or she has a potential cause of action or should begin an inquiry to protect his or her rights.[16]

Thus, under the discovery rule there are two possible dates on which the statute of limitations can begin to run[17] and, in some cases, "a third part to our discovery rule," which we discuss below.[18] The first potential date is "the date when [the] plaintiff reasonably should have discovered the existence of all essential elements of the cause of action."[19] The second potential accrual date is "the date when the plaintiff has information which is sufficient to alert a reasonable person to begin an inquiry to protect his rights."[20] As we explained in *Cameron v. State*, "[t]he dates are different, since the point when the elements of a cause of action are discovered may come after and as a result of a reasonable inquiry."[21] As we further explained in *Cameron*, the third part of the discovery rule comes into play "where a person makes a reasonable inquiry which does not reveal the elements of the cause of action within the statutory period at a point where there remains a reasonable time with-

---

**10.** AS 09.10.070(a).

**11.** *Gudenau & Co. v. Sweeney Ins., Inc.*, 736 P.2d 763, 767 (Alaska 1987).

**12.** *Palmer v. Borg–Warner Corp.*, 818 P.2d 632, 634 (Alaska 1990); *Mine Safety Appliances v. Stiles*, 756 P.2d 288, 292 (Alaska 1988) (citing *Russell v. Municipality of Anchorage*, 743 P.2d 372, 375–76 & n. 11 (Alaska 1987)).

**13.** *Palmer*, 818 P.2d at 634; *see Mine Safety*, 756 P.2d at 292 (citing *Russell*, 743 P.2d at 375–76 & n. 11).

**14.** The date on which the statute of limitations begins to run is usually the "date on which the plaintiff incurs injury." *Russell*, 743 P.2d at 375 (quoting *Gudenau*, 736 P.2d at 766–67). Injury often occurs simultaneously with the corresponding act of negligence that causes it. However, when the injury is not apparent at the time of the negligent act, the discovery rule applies. *Pedersen v. Zielski*, 822 P.2d 903, 906–07 (Alaska 1991).

**15.** *Pedersen*, 822 P.2d at 907.

**16.** *Mine Safety*, 756 P.2d at 291 (internal editing marks and citations omitted).

**17.** *Waage v. Cutter Biological Div. of Miles Lab., Inc.*, 926 P.2d 1145, 1148 (Alaska 1996) (quoting *Cameron v. State*, 822 P.2d 1362, 1366 (Alaska 1991)); *see also Sopko v. Dowell Schlumberger, Inc.*, 21 P.3d 1265, 1271 (Alaska 2001).

**18.** *Cameron*, 822 P.2d at 1367.

**19.** *Id.*

**20.** *Id.*

**21.** *Cameron*, 822 P.2d at 1366. The earliest possible inquiry-notice date of accrual was October 15, 1991—the date of the allegedly negligent act of Galloway. The latest possible actual-notice date was January 31, 1993—the date Cloudy informed the Lambs that their furnace was probably malfunctioning in a dangerous fashion.

in which to file suit." [22] In those circumstances, "the limitations period is tolled until a reasonable person discovers actual knowledge of, or would again be prompted to inquire into, the cause of action." [23]

The Lambs' argument that their cause of action did not accrue until January 1993, when they were informed that they had probably been exposed to carbon monoxide by their furnace, addresses the first potential date provided by the discovery rule. That is, the Lambs argue that their cause of action did not accrue until they had actual knowledge of the source of their injuries.[24] John's Heating argues that the Lambs had information "sufficient to alert a reasonable person to begin an inquiry" before December 22, 1991, or more than two years before the Lambs had filed suit. John's Heating's argument addresses the second accrual date possible under the discovery rule. Accordingly, we must decide whether the trial court erred by granting summary judgment when John's Heating produced evidence supporting the contention that the Lambs had sufficient information to prompt reasonable people to begin an investigation.

**2. John's Heating presented sufficient evidence to create a genuine issue of material fact as to the inquiry-notice date on which the statute of limitations began to run.**

Following the inquiry-notice approach under the discovery rule, John's Heating suggests that it provided sufficient information for a jury to find that the Lambs knew or should have known that they were being exposed to carbon monoxide as early as October 15, 1991. In the material supporting its summary judgment motion on this issue, John's Heating presented evidence to support its theory that the Lambs should have known that they were being exposed to combustion byproducts but took no action to protect themselves. John's Heating provided evidence that even under the Lambs' version of the facts they knew: (1) that an apparently malfunctioning furnace was causing them headaches, prompting them to call for a repair of the furnace; [25] (2) that Galloway did not correct the furnace problem because it continued to blow soot into the house; (3) that during the October 15 visit, Cynthia showed Galloway corrosion holes in the furnace cabinet, but Galloway did nothing, noting that he might have to "tear the furnace apart" to figure out what was wrong with it; (4) that Cynthia admitted she knew there was still a problem with the furnace after the Galloway service call; (5) that although Cynthia cleaned out the vents and ducts on a fairly regular basis, the soot problem persisted; (6) that the Lambs switched from the Bounce sheets to cut-up furnace filters because they thought furnace filters would do a better job; and (7) that the fuel smell persisted.

Our holding in *Meyer v. State, Department of Revenue, Child Support Enforcement Division, ex rel. N.G.T.*[26] shows that the evidentiary threshold necessary to preclude the entry of summary judgment is low. In *Meyer*, a paternity proceeding, we held that the putative father's sworn denial that he had engaged in sexual intercourse with the mother during the period of conception was sufficient to preclude the entry of summary judg-

---

22. *Id.* at 1367.

23. *Id.*

24. We note that this case presents a new variation on the application of the discovery rule, in that here the plaintiffs were arguably aware of the negligent act and its possible consequences and were therefore required to inquire in a timely manner into whether they were being injured. Previously, we have addressed situations in which either the injury and its cause were unknown, or the injury was known, but its cause was not. *Pedersen v. Zielski*, 822 P.2d 903, 907 (Alaska 1991). But in *Pedersen* we made clear

that the discovery rule "is broad enough to cover other undiscovered and reasonably undiscoverable elements" of the cause of action. *Id.*

25. At his deposition, Michael Lamb was asked, "Did you discuss with Cynthia why you needed to have a heating service person come out and look at your furnace?" He responded, "Yes, because I was sitting up there getting really bad headaches." This exchange was provided to the superior court during the briefing on John's Heating's motion for summary judgment on the statute of limitations issue.

26. 994 P.2d 365 (Alaska 1999).

ment despite significant evidence that he was the father—including the results of a genetic test that suggested that he was the father by a probability of 99.98 percent.[27]

The facts put forth by John's Heating, and the supporting deposition testimony of the Lambs, created a genuine issue of material fact as to whether the Lambs had sufficient information to constitute inquiry notice under the discovery rule. Accordingly, the trial court improperly granted summary judgment to the Lambs on the statute of limitations issue.

■■■■ We remand the statute of limitations issue to the superior court for determination as a preliminary question of fact.[28] Because the superior court granted summary judgment on the issue, John's Heating may have additional evidence that it would have presented at trial.[29] In that situation, the superior court has discretion to hear more evidence on the issue.

On remand, the superior court must first determine whether the Lambs had sufficient information to alert a reasonable person to begin an inquiry before December 22, 1991. If the superior court finds that the Lambs were on inquiry notice before December 22, 1991, the superior court must also determine whether the third part of the discovery rule applies. If the superior court finds that the Lambs were on inquiry notice and the third part does not apply to toll the statute of limitations, the Lambs' claim would be barred by the statute of limitations, and the jury verdict against John's Heating must be vacated. However, if the superior court finds otherwise, the jury verdict and award should stand subject to our rulings on the remaining issues of this appeal.

### B. The Superior Court Did Not Abuse Its Discretion in Admitting the Lambs' Expert Testimony.

John's Heating appeals the superior court's admission of the testimony of the Lambs' experts regarding their injuries from chronic carbon monoxide exposure. John's Heating attacks this admission of evidence on two fronts. First, John's Heating argues that the Lambs' experts' testimony does not meet the admissibility requirements of *State v. Coon*[30] and lacks sufficient evidentiary foundation. John's Heating argues that we must at the least remand this case so that the trial court can conduct a proper evidentiary hearing under the *Coon* standard.

During the pendency of this case, we decided the relevant test and standard procedure by which trial courts must evaluate challenged scientific evidence in *State v. Coon*.[31] In that decision, we moved away from the previous governing standard derived from *Frye v. United States*[32] and to a standard derived from *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[33] We adopted the position that the trial court is the "gatekeep-

**27.** *Id.* at 368.

**28.** *See Pedersen v. Zielski*, 822 P.2d 903, 907 n. 4 & 908 (Alaska 1991) (Questions concerning the application of the discovery rule that "are genuine issues of material fact ... must be resolved at an evidentiary hearing.") *See also Decker v. Fink*, 47 Md.App. 202, 422 A.2d 389, 394 (1980) ("[T]he judge becomes the factfinder for purposes of determining the applicability of the statute of limitations...."); *Shillady v. Elliot Community Hosp.*, 114 N.H. 321, 320 A.2d 637, 639 (1974) ("The discovery rule ... [is] based on certain equitable considerations[, which] ... require that the interests of the opposing parties be identified, evaluated and weighed in arriving at a proper application of the statute. The interpretation and application of a statute of limitations is traditionally within the province of the court.... This determination by the court should be made ordinarily at a preliminary hearing in advance of trial ...."); *Lopez v. Swyer*, 62 N.J. 267, 300 A.2d 563, 567 (1973).

**29.** "[T]he party opposing summary judgment need not produce all of its evidence but instead must only show the existence of a genuine factual dispute." *Meyer*, 994 P.2d at 367 (citing *Totem Marine Tug & Barge, Inc. v. Alyeska Pipeline Serv. Co.*, 584 P.2d 15, 25 (Alaska 1978)).

**30.** 974 P.2d 386 (Alaska 1999).

**31.** We assume without deciding that *Coon* applies here because both of the parties argued, and the superior court apparently decided, this issue under the standard adopted in *Coon*.

**32.** 293 F. 1013 (D.C.Cir.1923).

**33.** 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

er"[34] responsible for keeping out "junk science,"[35] noting that the "evidence rules give trial courts both the authority and the responsibility to determine the admissibility of such evidence."[36]

Our overall intent in *Coon* was to continue and clarify our liberal admissibility standard for expert witness testimony.[37] While we noted that by abandoning *Frye* we would sometimes allow evidence that had not been generally accepted by the scientific community and exclude evidence that had been generally accepted, we also noted the unlikelihood "that methodologies that were admitted under *Frye* and that remain generally accepted in the appropriate community will be excluded [under *Coon*]."[38] The net effect, then, should be including more expert testimony. "The principal reason for adopting the *Daubert* standard is to give the courts greater flexibility in determining the admissibility of expert testimony, so as to keep pace with science as it evolves."[39]

*Coon* listed four factors to be considered by a trial court in assessing the admissibility of scientific evidence:

> (1) whether the proffered scientific theory or technique can be (and has been) empirically tested (i.e., whether the scientific method is falsifiable and refutable); (2) whether the theory or technique has been subject to peer review and publication; (3) whether the known or potential error rate of the theory or technique is acceptable, and whether the existence and maintenance of standards controls the technique's operation; and (4) whether the theory or

technique has attained general acceptance.[40]

We noted in *Coon* that this standard might also be met by confirmation that the evidence is "derived by the scientific method [or] ... based on scientifically valid principles."[41] Additionally, the *Coon* requirement may be satisfied by a showing that "either (a) the expert's proffered testimony [grew] out of prelitigation research, or (b) the expert's research [was] subjected to peer review."[42]

1. **The theory that chronic carbon monoxide exposure is harmful is admissible under Coon and has sufficient evidentiary foundation.**

 John's Heating attacks the Lambs' experts' testimony based on three specific shortcomings: (1) although short-term, high-concentration carbon monoxide exposure is known to be harmful, insufficient evidence supports the extrapolation that long-term, low-level exposure is harmful; (2) differential diagnosis[43] is insufficient to prove that carbon monoxide exposure caused the Lambs' injuries; and (3) the Lambs failed to produce sufficient foundational evidence that they were exposed to carbon monoxide. Under the flexible *Coon* test, we review the superior court's decision for an abuse of discretion.[44]

The theory that chronic exposure to carbon monoxide has harmful effects satisfies two of the *Coon* factors: the theory enjoys general acceptance and has been published. All five of the experts, including Drs. McCarthy and Brent for John's Heating, agreed that chronic carbon monoxide exposure could be harmful. Dr. Becker testified more

---

**34.** *Coon*, 974 P.2d at 395.

**35.** *Id.* at 396–97.

**36.** *Id.* at 393.

**37.** *Id.*

**38.** *Id.* at 398.

**39.** *Id.* at 399.

**40.** *Id.* at 395.

**41.** *Id.* (quoting *Daubert v. Merrell Dow Pharm., Inc., (Daubert IV)*, 43 F.3d 1311, 1316 (9th Cir. 1995)).

**42.** *Id.* (quoting Jay P. Kesan, AN AUTOPSY OF SCIENTIFIC EVIDENCE IN A POST-DAUBERT WORLD, 84 GEO. L.J. 1985, 2003 (1996)).

**43.** Differential diagnosis, or differential etiology, is "the determination of which of two or more diseases with similar symptoms is the one from which the patient is suffering, by a systematic comparison and contrasting of the clinical findings." *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 807 (3d Cir.1997) (quoting STEDMAN'S MEDICAL DICTIONARY 428 (25th ed. 1990)).

**44.** *Coon*, 974 P.2d at 398.

broadly: "[C]linicians know that chronic low-level exposures cause problems in some people." This general acceptance supports reliability.

Several publications on chronic carbon monoxide exposure are available. The record contains two: a paper entitled "Memory Disturbances Following Chronic, Low–Level Carbon Monoxide Exposure" and the "Indoor Air Pollution" guide sponsored in part by the United States Environmental Protection Agency, which includes a table showing the effects associated with acute and less-than-acute blood concentrations of carbon monoxide. In addition, Dr. Hartlage has recently drafted a paper on chronic carbon monoxide exposure, which is in the process of peer review and publication, and Dr. Becker testified to the existence of other papers, case studies of chronic carbon monoxide exposure. The reliability of the theory that chronic carbon monoxide exposure is harmful is sufficiently supported by these publications and its general acceptance.

John's Heating argues that because the threshold level at which carbon monoxide becomes harmful is unknown, the theory that chronic carbon monoxide exposure is harmful is unreliable. John's Heating questions the extrapolation from the fact that acute exposure causes neurological harm to the theory that chronic exposure can also cause harm. Other courts have warned against unwarranted extrapolations and required such evidence to be "reasonable and scientifically valid." [45]

■ We conclude that the extrapolation from the fact that short-term, high-level carbon monoxide exposures are harmful (and sometimes fatal) to the theory that long-term, low-level carbon monoxide exposures are also harmful is generally reasonable. And the published case studies indicate that the theory is scientifically valid. The "analytical gap" between the known harmful acute exposures to carbon monoxide and the unknown threshold for harmful lower-level, longer-duration exposure is not fatal to admission of the Lambs' experts. Empirical testing is but one factor in the *Coon* test.

> [W]hile precise information concerning the exposure necessary to cause specific harm to humans and exact details pertaining to the plaintiff's exposure are beneficial, such evidence is not always available, or necessary, to demonstrate that a substance is toxic to humans given substantial exposure and need not invariably provide the basis for an expert's opinion on causation.[46]

The fact that such testing on humans simply cannot be ethically undertaken explains and excuses the lack of testing to some extent. In this case, the lack of empirical testing does not render the theory so unreliable as to require exclusion.

■ John's Heating also challenges the differential diagnosis methodology by which several of the Lambs' experts came to the conclusion that the Lambs were harmed by chronic exposure to carbon monoxide.

John's Heating's argument that the trial court should have excluded the Lambs' experts' differential-diagnosis testimony as scientifically unreliable fails because differential diagnosis is a standard medical methodology.[47] A strong majority of federal circuits deciding the issue have allowed expert testimony employing differential diagnosis.[48]

---

**45.** *Moore v. Ashland Chem., Inc.,* 151 F.3d 269, 279 (5th Cir.1998); *Daubert v. Merrell Dow Pharm., Inc.,* 43 F.3d 1311, 1319 & n. 11 (9th Cir.1995) (on remand).

**46.** *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 264 (4th Cir.1999).

**47.** *Westberry,* 178 F.3d at 262; *Baker v. Dalkon Shield Claimants Trust,* 156 F.3d 248, 252–53 (1st Cir.1998); *In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717, 758 (3d Cir.1994).

**48.** *Baker,* 156 F.3d at 252–53; *Zuchowicz v. United States,* 140 F.3d 381, 385–87 (2d Cir.1998); *Heller v. Shaw Indus.,* 167 F.3d 146, 154, 156–57 (3d Cir.1999); *Kennedy v. Collagen Corp.,* 161 F.3d 1226, 1228–30 (9th Cir.1998); *Ambrosini v. Labarraque,* 101 F.3d 129, 140–41 (D.C.Cir. 1996). Only the Fifth Circuit differs. In *Moore v. Ashland Chemical, Inc.,* 151 F.3d 269 (5th Cir. 1998), the court concluded that the district court did not abuse its discretion in excluding expert testimony on causation using differential diagnosis because the expert had not previously treated a patient with the same chemical exposure and had no scientific support for the general theory that any level of exposure to the chemical would cause the diagnosed condition. *Id.* at 277–79. The situation here is not comparable because the Lambs' experts all have experience treating car-

While an important aspect of assessing scientific validity (and therefore evidentiary reliability) is the ability of other scientists to test or retest a proponent's theory, differential diagnosis involves assessing causation with respect to a particular individual. This merely makes it a different type of science than science designed to produce general theories; it does not make it unreliable science.[49]

We decline to hold differential-diagnosis methodologies inadmissible in light of the medical community's daily use of the same methodologies in diagnosing patients.[50]

■■ Of course, "[a] differential diagnosis that fails to take serious account of other potential causes may be so lacking that it cannot provide a reliable basis for an opinion on causation."[51] But here that is not the case. Here, doctors experienced with carbon monoxide exposure performed the differential diagnosis, which included making physical examinations, taking medical history, and reviewing clinical tests. In addition, the diagnosis was bolstered by a temporal relationship between the symptoms and the possible carbon monoxide exposure and the discrepancy between Cynthia's performance and verbal IQs corresponding almost uniquely to carbon monoxide poisoning. An expert's causation conclusion should not be excluded because she has not ruled out every possible alternative; rather, existing possible alternatives should affect the weight that the jury gives the experts' testimony.[52] The Lambs' experts' theories are sufficiently reliable for admissibility under *Coon*. At most, John's Heating is arguing lack of certainty, but a lack of certainty does not preclude the useful application of a scientifically valid method.

■■ Finally, John's Heating contends that the Lambs did not provide any record evidence that they were exposed to carbon monoxide. According to John's Heating, there was not an adequate basis either for the experts to opine that the Lambs were exposed to carbon monoxide or for the jury to make the same finding.

Although the Lambs did not produce any direct evidence that they were ever exposed to carbon monoxide, such as ambient air measurements of carbon monoxide in their home or blood samples indicating elevated carboxyhemoglobin levels taken while the allegedly defective furnace was operating, they did provide circumstantial evidence. For instance, they provided the testimonial evidence of Cloudy and Clark that an improperly operating furnace with corroded components could introduce carbon monoxide into a home. And they provided pictures documenting the corroded condition of their furnace. Thus, there was an evidentiary footing from which both the Lambs' experts and the jury could build a logical framework of facts indicating the Lambs were exposed to carbon monoxide.

2. **The superior court did not commit reversible error by failing to hold an evidentiary hearing under the *Coon* standards before admitting the Lambs' experts' testimony.**

■■ John's Heating asserts that the trial court should have conducted a more thorough evidentiary inquiry before admitting the Lambs' experts' scientific testimony. John's Heating argues that the trial court effectively abandoned its "gatekeeper" role by failing to probe the validity and scientific bases of the Lambs' evidence when it was challenged in a pretrial motion. We note, however, that John's Heating merely filed a motion in limine to preclude the Lambs' experts' testimony. Because John's Heating did not ask the superior court for an evidentiary hearing, it effectively waived its right to one.[53]

bon monoxide exposure and because acute carbon monoxide exposure is known to cause brain damage.

49. *In re Paoli R.R. Yard PCB Litigation,* 35 F.3d at 758.

50. *Benedi v. McNeil–P.P.C., Inc.,* 66 F.3d 1378, 1384 (4th Cir.1995).

51. *Westberry,* 178 F.3d at 265.

52. *Heller,* 167 F.3d at 157; *Westberry,* 178 F.3d at 265.

53. *Matter of C.L.T.,* 597 P.2d 518, 522 (Alaska 1979) ("By consenting to certain procedures or by failing to object to others, a party may waive

In addition, we conclude that such a hearing was unnecessary in this case. Although a trial court should conduct an evidentiary hearing and perhaps even select its own independent expert witness or appoint an expert advisor when a proper challenge is brought to the admissibility of scientific evidence or testimony,[54] the trial court did not commit error by failing to conduct a hearing here. Neither the scientific methodology nor the evidentiary foundation was significantly in question in this case.

In sum, the Lambs' experts' theories are sufficiently reliable for admissibility under *Coon* and have adequate evidentiary foundation. Also, the trial court was not required to hold a *Coon* admissibility hearing *sua sponte*. Accordingly, the trial court did not abuse its discretion by admitting the testimony of the Lambs' medical experts.

### C. The Superior Court Properly Treated the Lambs' Claim as a Professional Negligence Claim; It Committed Harmless Error by Excluding the Testimony of Qualified Experts on the Standard–of–Care Issue.

John's Heating argues that the trial court erred by deeming this a professional negligence case. This raises two issues. The first is whether the actions of Galloway, the John's Heating employee who responded to the Lambs' request for service, should be held to a standard of care attributable to that of a skilled furnace repairperson acting under like circumstances. The second issue is whether expert testimony was required to establish the relevant standard of care. John's Heating also argues that the superior

court abused its discretion by excluding all testimony on the standard of care except that of Pat Clark, one of the Lambs' expert witnesses.

### 1. Because the level of skill and knowledge required of a competent furnace repairperson is specific to the skill of furnace service and repair, the Lambs' claim is one for professional negligence.

John's Heating argues that this case does not fall under the rubric of professional negligence. We disagree. A claim that a provider of skilled services committed negligence states a claim of professional negligence.[55]

It is a general rule of law that, when a person holds himself out to the public in any particular employment, work, or trade, there is an implied engagement with those who may employ him that he and his employees in that trade or business possess that reasonable degree of knowledge and skill which is ordinarily possessed by others engaged in the same business or trade; and that he and they will perform the services which he may be engaged to do, diligently and faithfully, and with that skill and prudence ordinarily possessed and observed by others engaged in the same or like employment.[56]

Courts have applied the professional negligence standard to trades persons including machinists, electricians, and plumbers.[57] Furnace repair is a similar trade. Thus, the superior court did not err by treating this case as one for professional negligence.

those rights which are arguably encompassed within due process guarantees.").

**54.** *State v. Coon*, 974 P.2d 386, 396 (Alaska 1999).

**55.** W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 32, at 185–86 (5th ed. 1984); *see, e.g., State, Dep't of Natural Res. v. Transamerica Premier Ins. Co.*, 856 P.2d 766, 772 (Alaska 1993) (stating that "[a] design professional has a duty in tort 'to exercise reasonable care, or the ordinary skill of the profession'") (quoting *Moloso v. State*, 644 P.2d 205, 217 (Alaska 1982)).

**56.** *Pusey v. Webb*, 47 A. 701, 702 (Del.Super.1900) (applying the professional negligence standard to a blacksmith).

**57.** *Person v. Cauldwell–Wingate Co.*, 187 F.2d 832 (2d Cir.1951); *Arkansas Machine & Boiler Works v. Moorhead*, 136 Ark. 18, 205 S.W. 980 (1918); *Stafford v. Gowing*, 236 Iowa 171, 18 N.W.2d 156 (1945). *See also* Jerry L. Moore, Liability of Artisans and Tradesmen for Negligence, in Professional Negligence 309, 310–11 (Thomas G. Roady, Jr. & William R. Andersen eds., 1960).

In addition, John's Heating's argument that this is not a professional negligence action is inconsistent with its proffered Jury Instruction 13. Modeled after the jury instruction at issue in *Pepsi Cola Bottling Company v. Superior Burner Service,*[58] Jury Instruction 13 sets out the standard for professional negligence:

> The defendant held itself out to the public generally as a qualified heating service company. *The defendant was required to exercise that degree of skill in handling the job for which it was called by the plaintiffs which a reasonably prudent, skilled and qualified heating service company would exercise under the circumstances.* If the defendant failed to use that degree of care and skill in performing the task, it was negligent toward the plaintiffs.[59]

John's Heating's argument that this language does not set out a professional standard of care is not well taken. The instruction explicitly calls for a standard of care that depends upon the relevant skill and care that a "reasonably prudent, skilled and qualified heating service company would exercise under the circumstances," not the skill or care that a reasonably prudent person would exercise, as would be the case if this was a claim for ordinary negligence.

**2. The superior court did not err by limiting the jury's consideration of the standard-of-care issue to the evidence presented by expert witnesses.**

■ John's Heating argues that "[i]t is difficult to imagine less need for expert testimony concerning [the] standard of care." While it is true that expert testimony is not required to establish the standard of care in all cases of professional negligence,[60] the trial court did not abuse its discretion by limiting the evidence on the standard of care to the testimony of the expert witnesses.

The trial court was correct in ruling that only witnesses with specialized knowledge of the furnace repair trade were competent to testify directly to the standard of care. We note that "under Alaska Evidence Rule 702, whenever a party intends to offer evidence concerning any scientific, technical, or other specialized knowledge, the party must establish that the witness who will offer this evidence possesses the knowledge, skill, experience, training, or education to offer an informed opinion on the subject."[61] We believe that the proper procedures for a furnace repairperson to follow on a service call are sufficiently technical that only a person with specialized training, knowledge, or experience in the subject of furnace repair could properly opine on the matter. Moreover, John's Heating points to no other evidence entered into the record by either party that would have assisted the jury in determining the standard of care.[62] Accordingly, the trial court correctly limited the jury's consideration of this issue to the evidence provided by witnesses with specialized knowledge and experience in the field of furnace service and repair.

**3. Jury Instruction 14 improperly excluded relevant expert testimonial evidence.**

■ John's Heating argues that the court abused its discretion by excluding all testimony on the standard of care except the testimony of Pat Clark, the Lambs' expert witness on furnaces and heating systems. The superior court instructed the jury to

---

**58.** 427 P.2d 833, 841 (Alaska 1967).

**59.** Jury Instruction 13 (emphasis added).

**60.** *Johnson & Higgins of Alaska Inc. v. Blomfield,* 907 P.2d 1371, 1374 (Alaska 1995) ("While expert testimony is generally required in medical malpractice cases, it is not a general requirement of all professional negligence actions, especially 'in non-technical situations where negligence is evident to lay people.'") (quoting *Kendall v. State,* 692 P.2d 953, 955 (Alaska 1984)).

**61.** *Ballard v. State,* 955 P.2d 931, 941 (Alaska App.1998) (internal quotation marks omitted) (quoting Alaska R. Evid. 702).

**62.** John's Heating does argue that the trial court improperly excluded from the jury's consideration the testimony of John Butler. We address that argument below. *See infra* Part IV.C.3.

consider only Pat Clark's testimony in deciding the standard of care:

> In order for you to decide whether there was negligence in this case, you shall first decide what level of knowledge, skill and care other reputable furnace repairmen would have used under similar circumstances. You shall make this decision only on the basis of the opinion offered by Pat Clark, a furnace repairman who has testified as an expert on the standard of care.[63]

Alaska Rule of Evidence 702(a) controls the admissibility of expert testimony.[64] Evidence Rule 702(a) explicitly allows a person with relevant skill, experience, or training that forms the basis for specialized or technical knowledge to assist the trier of fact in assessing an issue. In *Colt Industries Operating Corp., Quincy Compressor Division v. Frank W. Murphy Manufacturer, Inc.*,[65] we held that the trial court abused its broad discretion by precluding the plaintiff's mechanical engineering expert from testifying about an alleged design defect in a particular type of switch gauge because the mechanical device at issue was not specifically within the witness's expertise.[66] In *Colt Industries*, we emphasized that Evidence Rule 702 requires "simply that the witness' special knowledge must assist the trier of fact to understand the evidence or to determine a fact in issue."[67] We also specifically rejected a reading of Evidence Rule 702 that would require expertise "in *precisely* the area upon which the expert proposes to comment."[68]

Here, both Cloudy and Butler possessed specialized knowledge as to the heating service business. Both men were professionals in the heating services business in Kodiak: Cloudy had fifteen to twenty years of experience in the heating business as well as relevant carbon monoxide training; Butler had twenty-five years of heating service experience in the Kodiak area.[69] The exclusion of their testimony by Jury Instruction 14 denied John's Heating a witness to rebut Clark's assertions about the appropriate standard of care for a heating service professional. In addition, the exclusion prevented the jury from considering relevant testimony from Cloudy that may have been helpful. Since there was no rational distinction to be drawn between the relevant training and experience of Clark, Cloudy, and Butler, it was an abuse of discretion for the trial court to instruct the jury to ignore the testimony of Cloudy and Butler on the standard-of-care issue.

■ The superior court's exclusion of Cloudy and Butler's testimony, although erroneous, was harmless. John's Heating summarizes Butler's testimony as simply "that he believed Mr. Galloway's actions were appropriate." Our examination of Butler's testimony does not reveal anything more helpful to John's Heating's position. Since a conclusory statement by an employer that his employee's actions were appropriate does not help to substantively determine the applicable standard of care,[70] the trial court's exclusion of this testimony was harmless. And since our examination of the record reveals that Cloudy's testimony was more damaging

---

63. Jury Instruction 14.

64. Alaska Rule of Evidence 702(a) provides:
 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

65. 822 P.2d 925 (Alaska 1991) (superseded by statute on other grounds).

66. *Id.* at 932.

67. *Id.* (quoting *Norris v. Gatts*, 738 P.2d 344, 350 (Alaska 1987)).

68. *Id.*

69. By comparison, Clark had twenty-seven years of heating service experience.

70. *See generally Kraus v. Newton*, 14 Conn.App. 561, 542 A.2d 1163, 1167–68 & n. 4 (1988) (affirming trial court's instruction to jury that the employer's statement that "every employee should use great care in the performance of his duties" was not the standard of care that plaintiff was required to use but was an appropriate factor to consider in determining whether plaintiff acted reasonably).

to John's Heating than it was helpful,[71] we determine that the court's instruction to look only to Pat Clark's testimony on the standard of care was also harmless. Accordingly, we will not disturb the trial court's judgment on the basis of Instruction 14.

### D. The Trial Court Correctly Refused to Attribute Michael Lambs' Cessation of Work Solely to His Back Injury.

John's Heating also makes two arguments that challenge the trial court's legal treatment of Michael's back injury. First, John's Heating asserts that the superior court should have granted partial summary judgment that Michael's employment with the Coast Guard ended because of his back injury, not his possible carbon monoxide poisoning. John's Heating notes the inconsistency between Michael's position in his Coast Guard disability retirement proceeding—that his back was the sole cause of his inability to work—and his position in this litigation—that neurological deficiencies from chronic exposure to carbon monoxide prevented him from working.

Although the argument made by John's Heating is not devoid of merit, the threshold for opposing summary judgment is very low.[72] It is true that the credibility of Michael's claim that his employment ended due to neurological deficiencies caused by carbon monoxide exposure is weakened by (1) his prior inconsistent statement, (2) the statements of his doctors that Michael was unable to work due to his neurological deficiency and (3) his interrogatory answer that he was too embarrassed to mention his mental dysfunction. But the cause of his disability retirement is a material question for the jury to decide. Accordingly, we hold that the trial court properly denied John's Heating summary judgment on this issue.

Second, John's Heating argues that quasi-estoppel precludes Michael's claim that his back injury was not the sole cause of his disability retirement. Quasi-estoppel "precludes a party from taking a position inconsistent with one ... previously taken where circumstances render assertion of a second position unconscionable." [73] We have recognized five relevant criteria for evaluating a quasi-estoppel claim:

Among the many considerations which may indicate that an inconsistent position is unconscionable and the doctrine of quasi-estoppel should be applied are whether the party asserting the inconsistent position has gained an advantage or produced some disadvantage through the first position; the magnitude of the inconsistency; whether changed circumstances tend to justify the inconsistency; whether the inconsistency was relied on by the party claiming estoppel to his detriment; and whether the first assertion was made with full knowledge of the facts.[74]

Our analysis of the factors leads us to conclude that quasi-estoppel is inapplicable here. Michael's doctors testified that he was unable to work as a firefighter due to his neurocognitive disability. Even John's Heating's medical experts appeared to agree. Michael gained nothing from his original position because he would have been eligible for disability retirement benefits for either his back or his neurocognitive disability. With regards to reliance, John's Heating has conceded that "the only reliance by John's Heating on Lamb's representations that his back rendered him incapable to work, [sic] is John's Heating tax dollars which fund that disability retirement." In addition, Michael testified that he did not have full knowledge of the effects of his exposure to carbon monoxide until after he applied for disability retirement. His doctors' related testimony

---

71. For example, Cloudy testified as follows:
 Q: Do you as a furnace repairman concern yourself with the possible release of carbon monoxide into a home ...
 A: Yes, you do.
 Q: ... from a furnace?
 A: You sure do.
 Q: Is that an important consideration to you?
 A: More so all the time.

72. *Meyer v. State, Dep't of Revenue, Child Support Enforcement Div., ex rel. N.G.T.*, 994 P.2d 365, 367–68 (Alaska 1999), discussed *supra* at ——.

73. *Jamison v. Consolidated Util., Inc.*, 576 P.2d 97, 102 (Alaska 1978).

74. *Id.* at 102–03.

noted that people with brain injuries often do not recognize their injury and frequently suffer from denial. Under these conditions, failing to argue that his neurocognitive condition played a part in his disability retirement does not render unconscionable his later argument that it did. The trial court did not err by allowing Michael to present his claim.

### E. The Trial Court Erred by Awarding the Lambs Prejudgment Interest on the Future Damages Portion of the Jury Award.

■ John's Heating challenges the trial court's award of prejudgment interest on the portion of the jury's award attributable to future damages. John's Heating argues that awarding prejudgment interest on future damages amounted to an impermissible double recovery.

■ A jury award for future damages is discounted to present value as of the date of the verdict to reflect the fact that the damages are made part of a recovery before they would otherwise accrue. In this way, "the financial impact of the passage of time [is] incorporated into the jury's damage award, [and] any award of prejudgment interest on this amount would therefore constitute a double recovery." [75] For example, in *City of Whittier v. Whittier Fuel & Marine Corp.*,[76] we reversed the trial court's award of prejudgment interest on future profits that had not yet accrued at the time of judgment.[77] More recently in *Navistar International Transportation Corp. v. Pleasant*,[78] we affirmed a trial court's refusal to award prejudgment interest on future damages reduced to present value as of the time of trial.[79]

Here, the court properly instructed the jury on the issue of reducing the Lambs' future damages to their present value in Jury Instruction 22, which provided in part:

> Any award that you make for future economic loss must be equal to the amount of money that the plaintiff would need to invest *today* so that the total of the amount invested today plus future investment earnings equals the amount of the future economic loss when it will occur in the future.

(Emphasis in original.) Given this instruction to set the future damages award as of "today"—the date of the verdict—no prejudgment interest should have been awarded on future damages for the time between the date the complaint was served and the date the verdict was rendered.

The superior court, however, signed the plaintiffs' submitted final judgment order that contained damages calculations including prejudgment interest awarded on the future damages portion of the jury verdict.[80]

Because the award of prejudgment interest on future damages caused a double recovery, the trial court erred in accepting the plaintiffs' form of judgment. We remand for a recalculation without awarding prejudgment interest on the portion of the jury verdict attributed to future damages.

### F. Enhanced Prejudgment Interest Was Warranted in this Case.

■ John's Heating argues that the trial court erred by awarding an enhanced rate of prejudgment interest on the damages award. John's Heating cites *Brinkerhoff v.*

---

75. *Sebring v. Colver*, 649 P.2d 932, 936 (Alaska 1982).

76. 577 P.2d 216 (Alaska 1978).

77. *Id.* at 226.

78. 887 P.2d 951 (Alaska 1994).

79. *Id.* at 959–60.

80. The jury awarded Michael Lamb $45,000 in past damages and $765,000 in future damages. A forty-five percent reduction to account for Michael's comparative negligence yields $24,750 in past damages and $420,750 in future damages. The plaintiffs calculated prejudgment interest on the full award of $445,500 at an annual interest rate of 15.5% for the 1,680-day period from the date the complaint was filed until the date of the verdict, which resulted in a prejudgment interest award of $317,830.68. The correct calculation, applying prejudgment interest to only the past damages award, yields $17,657.26 in prejudgment interest. Thus, the total judgment for Michael should be $463,157.26, not the $763,330.68 awarded. The prejudgment interest award to Cynthia is similarly miscalculated.

*Swearingen Aviation Corp.*[81] as authority for the proposition that joint offers of judgment present apportionment issues that make them inappropriate for the penalty provision of Civil Rule 68.[82] But *Brinkerhoff* involved an offer made to joint offerees by a single offeror. The offer in that case was unapportioned. Apportionment difficulties are intrinsic to cases involving unapportioned joint offers because the offerees must agree as to how proceeds are to be divided (or how the responsibility for payment should be divided when the offerees are defendants). In *Taylor Construction Services, Inc. v. URS Co.*,[83] Chief Justice Rabinowitz, writing for an equally divided court, identified two factors that should be analyzed in deciding whether a joint offer should trigger Rule 68 penalties in the context of an offer made by joint offerors to a single offeree.[84] First, if "the offer was inclusive of all the relationships among the parties and their conflicting claims,"[85] and second, if "no apportionment difficulty existed,"[86] the unaccepted offer could trigger Rule 68 penalties.[87] We adopt the *Taylor* dispositional opinion's approach today.

Applying the *Taylor* factors, we conclude that the unapportioned joint offer in the instant case was a valid Rule 68 offer of judgment. First, there is no question that the unapportioned offer was "inclusive of all of the relationships among the parties and their conflicting claims." That is, had the offer been accepted, all claims between the parties would have been resolved. Second, no apportionment difficulties existed since the offeree, John's Heating, was a single entity.

The judgment finally rendered against John's Heating in favor of the Lambs was not more favorable to John's Heating than the offer. Under these circumstances, the superior court did not err in applying Civil Rule 68's penalty provisions.

### G. The Superior Court Did Not Abuse Its Discretion by Giving a Jury Instruction on Comparative Negligence.

On cross-appeal, the Lambs challenge the trial court's jury instruction on comparative negligence. The Lambs argue that no evidence supported the jury finding of comparative negligence. The Lambs also argue that the instruction given was ambiguous and unclear. We reject both arguments.

#### 1. The legal preclusion of comparative negligence in medical malpractice cases does not extend to the relationship between homeowners and furnace repairpeople.

The Lambs argue that the trial court abused its discretion by instructing the jury on comparative negligence when there was no evidence to support a finding of comparative negligence. The Lambs primarily argue that they were entitled to rely absolutely on Galloway's alleged assurances of safety. To support this notion, the Lambs cite a number of cases precluding comparative negligence instructions when patients relied on the advice of their physicians.

This theory fails for two reasons. First, a factual dispute existed regarding whether Galloway had notice of the allegedly danger-

---

81. 663 P.2d 937, 943 (Alaska 1983). In *Brinkerhoff* we stated that "[a]lthough problems of apportionment may not always be present, such difficulties are prevalent enough to warrant a general exclusion of joint offers from the penal cost provisions of Rule 68." *Id.*

82. Former Alaska R. Civ. P. 68(b), which applies to cases filed before August 7, 1997, provides, in relevant part:

· If the judgment finally rendered by the court is not more favorable to the offeree than the offer, the prejudgment interest accrued up to the date of judgment is entered shall be adjusted as follows:

. . . .

(2) if the offeree is the party defending against the claim, the interest rate will be increased by the amount specified in AS 09.30.065.

83. 758 P.2d 99 (Alaska 1988).

84. *Id.* at 102.

85. This phrase means that "[t]he settlement offer clearly indicated all claims between the parties would be resolved if the offer were accepted." *Id.*

86. *Id.* (internal quotation marks omitted).

87. *Id.*

ous condition of the furnace and whether he ever assured Cynthia Lamb that there was nothing to worry about. Thus, the jury had to decide whether the furnace was in a defective condition and whether Galloway should have noticed its defective condition. Second, the physician-patient cases that preclude a finding of comparative negligence to reduce a plaintiff-patient's award against his or her doctor do not apply in the context of a repairperson and a homeowner. A furnace repairperson is not a doctor; the asymmetry of information—crucial to the doctrine that there can be no comparative negligence by a medical patient—does not exist between a furnace repairperson and a homeowner. Accordingly, the superior court did not abuse its discretion by giving the comparative negligence instruction.

### 2. The jury instruction on comparative negligence was not ambiguous or unclear.

■ The Lambs also assert that the jury instruction on comparative negligence was ambiguous and unclear and that any findings under it were not supported by evidence. The relevant instruction, Jury Instruction 30, provides:

I will now define negligence for you, as it may apply to the Lambs' conduct. The Lambs were comparatively negligent if:

1) the furnace was in a dangerous condition;

2) either Mike or Cynthia Lamb knew that the furnace was in a dangerous condition;

3) either Mike or Cynthia used the furnace; and

4) the use of the furnace legally caused damage to the person who knew of the dangerous condition.[88]

The Lambs contend that a "lack of connecting 'ands'" between the three elements of the four-element instruction probably confused the jury. This contention is frivolous. The construction in which only the last ele-

ment of a list is joined by an "and" is a standard construction of English prose. In this form, the "and" is read in between all the elements of the list, although it only appears prior to the last element. Since a "lack of connecting 'ands'" comprises the Lambs' only contention that Jury Instruction 30 was ambiguous, we reject this argument.

### H. The Superior Court Correctly Allowed the Jury to Consider Evidence of Michael's Disability Retirement Because the Collateral Source Rule Did Not Apply.

■ The Lambs appeal the superior court's admission of evidence regarding Michael's Coast Guard disability retirement, contending that admission of the evidence violated the collateral source rule. We disagree.

■ The collateral source rule serves two roles in Alaska. First, it "prohibits the reduction of a plaintiff's damages when he [or she] has received compensation from another source." [89] Second, it precludes the introduction of "evidence of other compensation on the theory that such evidence would affect the jury's judgment unfavorably to the plaintiff on the issues of liability and damages." [90] But evidence of benefits provided to the plaintiff by an independent party may be admissible "if offered for a purpose other than the diminution of the plaintiff's damages." [91]

We are skeptical of the rule's applicability in a case where the benefits were ostensibly obtained as the result of an entirely separate injury, as is the case here. But we need not decide this issue, because Michael sought and obtained a Coast Guard disability retirement on the basis of a bad back. When he later claimed that his neurological condition caused his inability to work, John's Heating was entitled to defend on the ground that this claim was inconsistent with the earlier claim. While this evidence was harmful to Michael, it was presented for reasons inde-

---

88. Jury Instruction 30.

89. *Tolan v. ERA Helicopters, Inc.*, 699 P.2d 1265, 1267 (Alaska 1985).

90. *Id.*

91. *Id.* at 1268.

pendent of damage reduction.[92] The trial court did not violate the collateral source rule by admitting evidence of Michael's disability retirement.

### I. The Lambs Waived Their Challenge to the Jury's Special Verdict that Found that Michael Lamb Did Not Suffer Any Past Economic Damages Because They Failed To Present that Argument Before the Jury Was Discharged.

■ The Lambs also argue that the jury had no evidentiary basis on which to deny Michael past economic damages. The Lambs contend that the only evidence on the matter was their expert's testimony and that the expert's testimony was that Michael's past economic damages amounted to $167,270. The Lambs' argument amounts to one that the jury's verdict was inconsistent because it compensated Michael for past non-economic damages, future economic damages, and future non-economic damages, but failed to award Michael anything for past economic damages.[93]

An inconsistent verdict argument must be raised before the jury is dismissed.[94] The Lambs did not present this issue to the superior court before the jury was dismissed. The Lambs therefore waived the argument that the jury's verdict was inconsistent and cannot bring it for the first time here.[95]

## V. CONCLUSION

Because there was a genuine issue of material fact as to whether the Lambs had sufficient information to constitute inquiry notice under the discovery rule, we must VACATE the grant of summary judgment on the statute of limitations issue and REMAND for further proceedings on this issue. Because it was error to award prejudgment interest on the portion of the damages attributable to future damages, we REVERSE that portion of the judgment. On remand, if the superior court finds in favor of John's Heating on the statute of limitations issue, the jury verdict and award in the Lambs' favor shall be vacated and judgment entered in favor of John's Heating. If the superior court finds in favor of the Lambs on the statute of limitations issue, the jury verdict and award shall stand, but the superior court shall recalculate the prejudgment interest at the standard rate without awarding interest on the future damages portion of the jury award. In all other respects, we AFFIRM the judgment of the superior court.

---

**92.** *See id.*

**93.** *See, e.g., McCubbins v. State, Dep't of Natural Res., Div. of Parks and Recreation*, 984 P.2d 501, 506 (Alaska 1999) ("[T]he jury's verdict awarding damages for future medical expenses but not for diminished earning capacity was inconsistent."); *Fancyboy v. Alaska Village Elec. Co-op., Inc.*, 984 P.2d 1128, 1135 (Alaska 1999) (affirming superior court's refusal to reinstate as inconsistent a jury verdict which found that the defendant's negligence was the cause of the plaintiffs' injuries but which failed to make any award for medical expenses or non-economic damages).

**94.** *Nelson v. Progressive Corp.*, 976 P.2d 859, 863 (Alaska 1999) ("[A] litigant waives his right to challenge the consistency of a jury's verdict if he fails to raise the issue and move for resubmission prior to the jury's discharge.").

