Vicki MARSINGILL, Appellant,

v.

James O'MALLEY, M.D., Appellee.

No. S–11578.

Supreme Court of Alaska.

Jan. 27, 2006.

Robert H. Wagstaff, Law Offices of Robert H. Wagstaff, Anchorage, and Richard H. Friedman, Friedman Rubin & White, Anchorage, for Appellant.

Howard A. Lazar and Donna M. Meyers, Delaney, Wiles, Hayes, Gerety, Ellis & Young, Anchorage, for Appellee.

Before: BRYNER, Chief Justice, MATTHEWS, FABE, and CARPENETI, Justices.

*OPINION*

BRYNER, Chief Justice.

## I. INTRODUCTION

Vicki Marsingill sued Dr. James O'Malley when, after failing to follow his recommendation to report to the emergency room, she suffered severe permanent injuries. At trial, she argued that had Dr. O'Malley adequately informed her of the risks of her condition, she would have heeded his advice and thereby avoided injury. A jury found in favor of Dr. O'Malley. Marsingill appeals, arguing that the jury instructions were flawed, that the court allowed inadmissible expert testimony, and that the award of attorney's fees was too high. We conclude that the jury instructions adequately stated the law. We also conclude that expert testimony concerning what a reasonable patient wants to know and what doctors think patients want to know is admissible in an informed consent case. But because the uncontroverted evidence indicates that the trial court awarded attorney's fees for non-compensable work, including political lobbying and appellate work, we vacate the fee award and remand the case so that the court can reevaluate the billing statements submitted by Dr. O'Malley's attorneys.

## II. FACTS AND PROCEEDINGS

The facts leading up to the present lawsuit were summarized in an earlier appeal as follows:

In October 1994 Dr. O'Malley performed surgery to remove staples that another surgeon had previously placed in Vicki Marsingill's stomach to facilitate weight loss. By January 1995 Marsingill had recovered from the surgery and was cleared to return to work.

While dining out with a friend on the evening of February 14, 1995, Marsingill "suffered a sudden onset of illness, was in pain, felt nauseous, and was unable to eat, so [went] home." Her pain worsened over the next few hours, and she eventually asked her daughter to call Dr. O'Malley. Her daughter told Dr. O'Malley that Marsingill looked bad, that she was nauseous and in pain, that she was unable to burp or have a bowel movement, and that her stomach was "as hard as a rock." Dr. O'Malley then spoke directly with Marsingill, who sounded anxious and upset. She informed him that she was having abdominal pain, felt bloated, and could not burp. Dr. O'Malley advised Marsingill that he could not evaluate her over the phone but that "if she felt bad enough to call him at night" she should go the emergency room. He repeated this advice several times but did not venture any opinion about the cause of Marsingill's symptoms or tell her that her condition was potentially life-threatening or serious. He left it up to her whether to seek emergency room treatment.

When Marsingill asked what would happen at the emergency room, Dr. O'Malley informed her that the doctors there would probably take x-rays and insert a nasogastric tube to relieve the pressure in her stomach.[1] Dr. O'Malley knew that Marsin-

gill had previously had nasogastric tubes inserted and, like most patients, strongly disliked them. Soon after hearing that she would likely need to have a nasogastric tube inserted if she went to the emergency room, Marsingill ended the call, telling Dr. O'Malley that she thought that she could burp and was feeling better.

After hanging up, Marsingill told her daughter that she was feeling better and would try to "tough it out for awhile." But later that night Marsingill's husband found her unconscious on the bathroom floor. Paramedics rushed her to the hospital, where an emergency operation later revealed that she had experienced an intestinal blockage. But by then the obstruction had caused Marsingill to go into shock; as a result, she suffered brain damage and partial paralysis.[1]

[1] Inserting a nasogastric tube involves placing a tube through the patient's nose, down the back of the throat into the esophagus, and into the stomach.

Marsingill filed suit against Dr. O'Malley alleging, in part, that Dr. O'Malley's treatment of her condition was negligent. She claimed that Dr. O'Malley "lacked skill and knowledge in general surgery and, as a result, committed malpractice by giving Marsingill incompetent advice when she called about her symptoms." [2] Marsingill tried unsuccessfully to introduce evidence regarding the educational credentials of Dr. O'Malley.[3] Marsingill and Dr. O'Malley also each presented experts on the subject of the level of care given. Marsingill's experts uniformly agreed that Dr. O'Malley's actions fell below the accepted standard of care because he failed to communicate the seriousness of Marsingill's condition and needlessly told Marsingill that she would likely be treated with the painful use of nasogastric tubes.[4] Dr. O'Malley's experts uniformly stated that Dr. O'Malley had provided "very good care" and had done his duty by not speculating on possible causes of symptoms, but rather advising Marsingill to go to the emergency room.[5]

Marsingill also argued that by failing to inform her that her condition could be quite serious, Dr. O'Malley breached his duty to "give Marsingill enough information to enable her to make an informed choice about going to the emergency room for treatment." [6] The experts from each side weighed in on this issue. Marsingill's experts stated that Dr. O'Malley had failed in his duty to give enough information for Marsingill to make an intelligent choice about whether to seek emergency room treatment.[7] Dr. O'Malley's experts stated that simply advising Marsingill to go to the emergency room was the appropriate action to take, and that this advice fulfilled Dr. O'Malley's duty to provide information.[8]

Marsingill proposed jury instructions covering these alternative theories of liability—malpractice and a lack of informed consent.[9] Her proposed instructions on the informed consent claim were rejected. As we noted in *Marsingill I*:

> Marsingill's proposed instruction would have required the jury to decide the sufficiency of Dr. O'Malley's communications from the standpoint of a reasonable patient in Marsingill's position. But the trial court rejected the proposed "reasonable patient" instruction, instead directing the jury to measure Dr. O'Malley's compliance by relying exclusively on the expert testimony addressing his compliance with a general surgeon's professional standard of care.[10]

At the end of the first trial, the jury returned a verdict for Dr. O'Malley on all counts. Marsingill appealed. We vacated the judg-

1. *Marsingill v. O'Malley*, 58 P.3d 495, 497–98 (Alaska 2002) (*Marsingill I* ).

2. *Id.* at 498.

3. *Id.*

4. *Id.*

5. *Id.* at 498–99.

6. *Id.* at 498.

7. *Id.* at 499.

8. *Id.*

9. *Id.*

10. *Id.*

ment and remanded on the informed consent claim.[11] We noted that our cases had already established that a physician has a duty to provide a patient with enough information to allow a reasonable patient to make an informed and intelligent decision concerning whether to proceed with treatment.[12] We ruled that whether a doctor had fulfilled this duty should be measured not by the standard practice of physicians, but rather from the perspective of the reasonable patient.[13] We noted that "[o]n remand, the jury must be instructed to decide the claim from the standpoint of a reasonable patient." [14]

On remand, two disputes arose. First, the parties disagreed over the proper role of expert testimony in an informed consent trial. Marsingill objected to two forms of expert testimony offered by Dr. O'Malley: she argued that Dr. O'Malley's experts should not be allowed to testify concerning the standard of care for physician disclosures because their views were not directly relevant to what a reasonable patient would want to know; in addition, she argued that the experts should not be allowed to testify concerning what a reasonable patient would want to know, because Dr. O'Malley's witnesses were not experts on the subject. Marsingill further argued that expert testimony on both issues would be prejudicial. The court allowed the experts to testify, though it did provide limiting instructions. The challenged experts for Dr. O'Malley were Dr. Moossa (on a videotape), Dr. Macho, and Dr. Gardiner, all surgeons, as well as Dr. Braddock, a medical ethicist.

The second dispute involved how much information a doctor was required to provide to a patient inquiring about medical treatment. Relying on *Marsingill I*, Dr. O'Malley argued that the doctor was only required to provide the patient with "enough information" to enable a reasonable patient to make an informed and intelligent decision. Mar-

singill, in contrast, argued that the jury should be instructed that "[a] physician owes a duty to disclose to his patient *all information which would be material* to a reasonable patient's informed and intelligent decision regarding matters of treatment and health." The superior court settled on an instruction describing the physician's duty as a duty to provide "material information," thus omitting Marsingill's proposed language referring to "*all*" material information.

The jury found in favor of Dr. O'Malley. Based on the verdict, the court awarded Dr. O'Malley $96,354.92 in attorney's fees.

Marsingill appeals.

## III. DISCUSSION

Marsingill raises three points on appeal. She argues that the admission of expert testimony concerning both the standard of care and what a reasonable patient would want to know amounts to reversible error. She argues that the failure to include the word "all" in the jury instructions misstated the law. And she argues that the award of attorney's fees was too high—that Dr. O'Malley's attorneys billed unreasonably high hours for some of their work and that Dr. O'Malley sought attorney's fees for non-compensable work.

### A. Standard of Review

■ This court reviews jury instructions de novo.[15]

■ We review the admission of expert testimony for abuse of discretion.[16] An abuse of discretion exists when we are left with a definite and firm conviction that an error has been made.[17] But when "the admissibility of evidence turns on whether the trial court applied the correct legal standard,

11. *Id.* at 505.

12. *Id.* at 503.

13. *Id.* at 503–04, 505.

14. *Id.* at 505.

15. *See Jackson v. Am. Equity Ins. Co.*, 90 P.3d 136, 141 (Alaska 2004).

16. *See John's Heating Serv. v. Lamb*, 46 P.3d 1024, 1030 (Alaska 2002).

17. *See Samaniego v. City of Kodiak*, 80 P.3d 216, 218–19 (Alaska 2003).

we review the court's decision using our independent legal judgment."[18]

We similarly review a trial court's order of attorney's fees for abuse of discretion.[19] We will only reverse an award of attorney's fees when the award is "arbitrary, capricious, manifestly unreasonable, or stems from an improper motive."[20]

## B. Expert Testimony

Dr. O'Malley presented three live testimony experts: Dr. Braddock, Dr. Macho, and Dr. Gardiner. The videotaped testimony of a fourth expert, Dr. Moossa, was presented at trial. Each testified that he would have behaved similarly to Dr. O'Malley and that Marsingill had all the information she needed to make an intelligent and informed decision. The testimony of the experts was allowed over Marsingill's pretrial motion to preclude it. She argued that it was not relevant to what a reasonable patient would want to know and that the doctors should not be allowed to testify concerning what a reasonable patient would want to know, because they were not experts on the subject. Marsingill also argued that expert testimony on both issues would be more prejudicial than probative. The trial court nevertheless allowed the doctors to testify on a limited number of subjects:

> Expert trial testimony will be limited to the risks facing [Ms.] Marsingill on February 14, and to what medically caused her injuries on that date.

> Experts may discuss the medical problems confronting Ms. Marsingill, the information available to [Dr. O'Malley], and what the expert believes would be material information in the context of Feb 14, '95 to

enable a reasonable patient to make an intelligent decision.

> The experts may opine whether the information provided was sufficient to enable an intelligent decision based on material information.[21]

Dr. Braddock testified that when a patient calls a physician at night, the main question a patient wants answered is, "should I be really worried and go into the hospital right now, or not." He testified that it is generally inappropriate to tell patients that they might die, because it might unduly alarm them or seem overly melodramatic and manipulative. Dr. Braddock also testified that he believed that Marsingill had enough information to decide whether to go to the emergency room. He explained that he arrived at this conclusion by considering three perspectives:

> One is thinking about what most people would ... with a complaint of abdominal pain and the kind of situation that she was in what they would ... need to hear to be able to make a decision about, you know, do I stay home, do I go to the emergency room. Second, reflecting on ... patients that I've had or other sort of more hypothetical people, if they heard the advice that they got over the phone, what they would likely actually do. And I think that most anyone hearing the advice that, you know, I can't tell what's going on over the phone, you should go into the emergency department, I'll call and expedite things, I'll meet you there, you know, that's conveying that I should probably go. I think most people would go. I certainly know I would go. And third, sort of just reflecting on what I would say to a patient who called me in the middle of the night with those kind of complaints. Now, I'm not a

18. *Alderman v. Iditarod Properties, Inc.,* 104 P.3d 136, 140 (Alaska 2004) (*Alderman I* ).

19. *Id.* at 140.

20. *Nichols v. State Farm Fire & Cas. Co.,* 6 P.3d 300, 303 (Alaska 2000) (quoting *Jones v. Jones,* 925 P.2d 1339, 1340 (Alaska 1996)).

21. In allowing the expert testimony to be admitted for these limited purposes, the court also asked the parties to consider the possibility of instructing the jury:

> Some opinions expressed by experts in this case on the topic of "what a reasonable person would expect" or "what a reasonable person would need to know" are not being admitted as *expert* opinion (or testimony) in the classic sense, but simply as opinions on a topic relevant to trial about which they have considered thoughts. The experts are not appearing before the court as linguists or expert reasonable patients. What weight is to be given their testimony on this topic is wholly for the jury to determine in light of all the evidence and instructions.

surgeon so I might not know some of the subtle nuances of what might be expected ... after the kind of surgeries that she'd had, but I have seen lots of people with bowel obstructions, and I know the kinds of symptoms, I know the kind of advice that I would give. So based on those three things I think that she had the information she needed to make an informed choice.

Dr. O'Malley's second expert, Dr. Macho, also testified that he would have communicated the same information to Marsingill that Dr. O'Malley had. He noted that there were a large number of conditions that might have caused Marsingill's symptoms. He testified that he would not have informed Marsingill of any of the specific concerns that he had, both because there were too many possibilities and because,

> [y]ou would have to include possibilities that are serious and possibilities that are trivial. Some patients will focus on what's serious and other patients will focus on what's trivial.... So, you know, telling them all this information could actually be misleading or falsely reassuring to the patient.

In addition, Dr. Macho testified that without examining Marsingill in person, it would be impossible to know which of those conditions was causing her symptoms:

> [A]s a surgeon what you want to do is you want to know what the problem is. You don't want to know a whole list of possibilities. And the way that you could narrow down on the problem is by having the patient simply come to the emergency room and be evaluated. So, you know, it was really the only logical thing to tell the patient.

Dr. Macho also believed that Marsingill had enough information to make a decision. He said that in some circumstances (e.g., where a patient is having a heart attack) it might be appropriate to warn a patient that failure to go to the emergency room might be fatal, but in Marsingill's situation such a warning would not have been appropriate.

Dr. Gardiner, another of Dr. O'Malley's experts, agreed with Dr. Macho that because patients sometimes hear what they want to hear, giving patients a list of possibilities would not be appropriate over the telephone. He testified that he faced similar situations to the present case almost weekly and that he had never responded significantly differently than Dr. O'Malley.

Dr. Gardiner also testified that Dr. O'Malley had provided Marsingill with the information necessary to make an informed and intelligent decision. Specifically, Dr. Gardiner pointed out that Dr. O'Malley communicated that he could not diagnose Marsingill over the phone, that if Marsingill felt enough pain to call at ten o'clock at night she should go to the emergency room, and that if she did go, Dr. O'Malley would facilitate her intake process when she arrived. Dr. Gardiner further noted that by telling Marsingill that he would meet her at the emergency room, Dr. O'Malley communicated that he took Marsingill's condition "very seriously." Dr. Gardiner also noted that Dr. O'Malley had accurately explained what Marsingill could expect at the emergency room: that he would examine her, "do some blood work, do some x-rays, and possibly pass a nasogastric tube."

In addition, Dr. Gardiner expressed the view that Dr. O'Malley had given Marsingill all of the information that she genuinely needed. He testified that communicating any of the myriad possible causes to Marsingill would have been nothing more than "pure speculation, guess work," and that most patients do not expect that over the phone.

Marsingill argues that the superior court should not have allowed Dr. O'Malley's experts to discuss the standard of care for physician disclosures or what a reasonable patient would want to know. According to Marsingill, this testimony was not relevant or helpful, the doctors lacked expertise in what a reasonable patient would want to know, and their opinions were unfairly prejudicial. We consider each of these arguments below.

### 1. Relevance

█ Alaska's informed consent statute, AS 09.55.556(a), requires physicians to disclose the common risks and reasonable alterna-

tives to a proposed treatment or procedure.[22] But as we noted in Marsingill's first appeal, the statute fails to specify what standard governs the scope of the disclosure requirement.[23] We have rejected the traditional "professional standard in the field" approach in favor of "the modern trend" of case law, which "measure[s] the physician's duty of disclosure by what a reasonable patient would need to know in order to make an informed and intelligent decision." [24]

■ As we stressed in *Marsingill I*, "a physician must disclose those risks which are 'material' to a reasonable patient's decision concerning treatment." [25] We held in *Marsingill I* that the determination of materiality had two parts: (a) "to define the existence and nature of the risk and the likelihood of its occurrence"; and (b) to decide "whether the probability of that type of harm is a risk which a reasonable patient would consider in deciding on treatment." [26] We also recognized in *Marsingill I* that while expert testimony may be necessary to satisfy the first prong of the test, it is not necessary to satisfy the second prong: [27]

> The second prong of the materiality test is for the trier of fact to decide whether the probability of that type of harm is a risk which a reasonable patient would consider in deciding on treatment. The focus is on whether a reasonable person in the patient's position would attach significance to the specific risk. This determination does not require expert testimony.[28]

Relying on this aspect of our ruling in *Marsingill I*, Marsingill argues that Dr.

O'Malley's witnesses should not have been allowed to testify either about the general standard of care for physician disclosures or about what a reasonable patient would want to know. She asserts that the testimony is inadmissible because a physician's opinion concerning what information the physician thinks is important is not directly relevant to establish what a reasonable patient would deem to be important. Marsingill's arguments on this point are unpersuasive.

■ To be admissible under our rules, evidence need not be "directly relevant" to the fact that it seeks to establish. Alaska Rule of Evidence 401 provides that evidence is relevant if it has the "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." This definition of relevant evidence is a broad one.[29] The Commentary to the Rules of Evidence, cited in *Denison v. Anchorage*,[30] stresses that

> [t]he standard of probability under the Rule is "more ... probable than it would be without the evidence." Any more stringent requirement is unworkable and unrealistic....
>
> The words "any tendency" in the rule suggest that the court should err, in doubtful cases, on the side of admissibility.[31]

Thus, "[t]o be relevant [under Evidence Rule 401], evidence need not be direct or conclusive; it need only have some tendency to advance the proposition for which it is offered." [32] And as *Denison* also recognized,

---

**22.** AS 09.55.556(a) provides that:

> A health care provider is liable for failure to obtain the informed consent of a patient if the claimant establishes by a preponderance of the evidence that the provider has failed to inform the patient of the common risks and reasonable alternatives to the proposed treatment or procedure, and that but for that failure the claimant would not have consented to the proposed treatment or procedure.

**23.** *See Marsingill I,* 58 P.3d at 503 (citing *Korman v. Mallin,* 858 P.2d 1148–49 (Alaska 1993)).

**24.** *Marsingill I,* 58 P.3d at 503 (quoting *Korman,* 858 P.2d at 1148–49).

**25.** *Id.* (quoting *Korman,* 858 P.2d at 1149).

**26.** *Id.* at 504.

**27.** *Id.*

**28.** *Id.*

**29.** *See Van Meter v. State,* 743 P.2d 385, 392 (Alaska App.1987).

**30.** *See Denison v. Anchorage,* 630 P.2d 1001, 1003 (Alaska App.1981).

**31.** Alaska R. Evid. 401 Commentary.

**32.** *McLaughlin v. State,* 818 P.2d 683, 687 (Alaska App.1991). *See also Byrne v. State,* 654 P.2d 795 (Alaska App.1982); *Denison,* 630 P.2d at 1003.

Evidence Rule 402 "embodies a basic preference for admission of all relevant evidence unless such evidence is otherwise specifically made inadmissible by constitution, statute or rule." [33]

■■■■■ The doctors who testified in this case had extensive experience interacting with patients. Under the broad definition of Rule 401, their testimony concerning the amount and kinds of information that patients generally want in late night phone calls was relevant to establish whether Dr. O'Malley gave Marsingill as much information as a reasonable patient would want to know. In addition, their testimony was relevant to show what a reasonable doctor is likely to think a patient might want to know. When determining whether a doctor is liable for failing to disclose sufficient information, the standard of liability is negligence and not strict liability.[34] A doctor's failure to provide sufficient information will not render him liable unless the doctor knew or reasonably should have known that the patient might have considered the information to be important. The jury instruction defining materiality reflected this negligence standard, telling the jury that "material information" is "information which the surgeon knows or should know would be regarded as significant by a reasonable person in the patient's position when deciding to accept or reject medical treatment." Marsingill did not object to this aspect of the instructions. As a result, while the standard of care exercised by physicians with regard to disclosures does not determine what a reasonable patient would want to know, it is unquestionably relevant in determining whether a doctor was negligent when assessing what a reasonable patient would want to know.

## 2. Helpfulness

■■■■■ Under Alaska Rule of Evidence 702 "scientific, technical, or other specialized knowledge" may be heard only if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." [35] Under this rule, we have held that the primary criterion for determining whether a witness should be permitted to give expert testimony is "whether the jury can receive appreciable help from this particular person on this particular subject." [36]

■■■■■ For the same reasons that the disputed testimony was relevant, it could also be considered helpful to the trier of fact. The doctors had a broad range of experience in providing information that their patients needed. Similarly, the doctors were able to testify concerning the kinds and amount of information that they, as experienced members of their field, perceived patients to desire. The trial court could reasonably find that both sorts of testimony might help the jurors to determine whether Dr. O'Malley gave Marsingill enough information to enable her to make an informed treatment decision.

## 3. Reliability

■■■■■ Alaska Rule of Evidence 702 requires that the trial court determine the reliability of expert testimony: the witness must be "qualified as an expert by knowledge, skill, experience, training, or education." [37] Our case law has described two general categories of expert testimony: (a) expert testimony based on technical or scientific research and testing; [38] and (b) expert testimony based on practical experience in the relevant field.[39]

33. *Denison,* 630 P.2d at 1003.

34. *See, e.g., Jaskoviak v. Gruver,* 638 N.W.2d 1, 6–7 (N.D.2002); *McKinley v. Stripling,* 763 S.W.2d 407, 409 (Tex.1989); *Fortier v. Traynor,* 330 N.W.2d 513, 517 (N.D.1983) ("[T]he doctrine of informed consent is a form of negligence which essentially relates to a duty of a doctor to disclose pertinent information to a patient.").

35. Alaska R. Evid. 702(a) (providing that qualified experts may "testify thereto").

36. *Handley v. State,* 615 P.2d 627, 631 (Alaska 1980) (quoting *Crawford v. Rogers,* 406 P.2d 189, 192 (Alaska 1965)).

37. Alaska R. Evid. 702(a).

38. *See generally State v. Coon,* 974 P.2d 386 (Alaska 1999).

39. *See Getchell v. Lodge,* 65 P.3d 50, 56–57 (Alaska 2003).

Marsingill argues that Dr. O'Malley's experts did not possess adequate scientific knowledge to offer expert opinions concerning what a reasonable patient would want to know. To support this argument, Marsingill relies on *State v. Coon*;[40] there, we approved the reliability and relevance requirements adopted by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[41] for admitting expert testimony based on scientific theory.[42]

In response to this argument, Dr. O'Malley correctly counters that his witnesses derived their expertise from experience and so do not need to meet the requirements of *Coon* and *Daubert*. In *Marron v. Stromstad* we limited our reliance on the *Daubert* test to expert testimony based on scientific theory; we noted that testimony based on personal experience is not covered by this standard.[43] Because the disputed evidence here consisted of experience-based testimony, it did not need to meet the stricter *Daubert/Coon* test.[44]

Dr. O'Malley's experts possessed the relevant personal experience. Each had extensive experience with patients and was routinely called upon to respond to patients' questions during late night telephone calls. In addition, Dr. Braddock had completed several studies on the amount of information that doctors give patients in a variety of circumstances. As the trial court correctly observed, "an understanding of what a patient needs to know ... and understanding what a doctor needs to say, is ... related to what doctors do." We have consistently recognized that experience-based expert testimony is admissible when the expert witness has substantial experience in the relevant field and the testimony might help the jury.[45]

### 4. Unfair Prejudice

Under Alaska Rule of Evidence 403, "evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury[.]"[46] We will only overturn a superior court's Rule 403 balancing determination if we find an abuse of discretion.[47] Marsingill suggests that even if the doctors' testimony concerning the standard of care and what a reasonable person would want to know were otherwise admissible, it should have been excluded because it "could not help but confuse the jury." According to Marsingill, "[t]his confusion was prejudicial ... and warrants a reversal." We are not persuaded.

Marsingill in effect contends that the expertise of the doctors and the fact that they were well respected rendered their testimony overly persuasive. But if expertise renders a witness's otherwise relevant testimony unfairly prejudicial, all expert testimony would be excluded. There is always a risk that juries might weigh expert opinion too heavily; for precisely this reason, jury instructions routinely remind jurors that they are not bound to accept or believe the testimony of experts.[48] This was true of the

**40.** 974 P.2d 386.

**41.** 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

**42.** *Coon*, 974 P.2d at 395.

**43.** *Marron v. Stromstad*, 123 P.3d 992 (Alaska 2005) (explicitly rejecting the extension of *Daubert* suggested in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)).

**44.** We note that the concurring opinion in *Marron* favored retaining the *Daubert/Coon* test for experience-based expert testimony but advocated a lenient and flexible application of that test. *Marron*, 123 P.3d at 1014–17 (Bryner, Chief J., concurring). In our view, the expert testimony disputed in this case would have been readily admissible under the alternative approach set out by the concurring opinion in *Marron*.

**45.** *See, e.g., Getchell*, 65 P.3d at 57; *John's Heating Serv. v. Lamb*, 46 P.3d 1024, 1039 (Alaska 2002).

**46.** Alaska R. Evid. 403.

**47.** *See, e.g., City of Kodiak v. Samaniego*, 83 P.3d 1077, 1087 (Alaska 2004); *Alaska Northern Dev., Inc. v. Alyeska Pipeline Serv. Co.*, 666 P.2d 33, 42 (Alaska 1983).

**48.** Alaska Pattern Civil Jury Instruction 2.10 (rev.1999) provides in part:

As with other witnesses, you must decide whether to believe an expert and how much weight to give to expert testimony. You may believe all, part, or none of the testimony of an

instructions given in the present case. Moreover, the instructions correctly emphasized that the standard for determining whether sufficient information had been relayed to Marsingill was that of the reasonable patient, not the patient's physician. Read together, the instructions in this case adequately informed the jury that it need not defer to the doctors' conclusions concerning what a reasonable patient in Marsingill's position would have wanted to know. The trial court did not abuse its discretion in determining that the challenged expert testimony was not unfairly prejudicial.

### C. Jury Instructions

 Marsingill's second claim of error is that the jury instructions failed to accurately describe the standard for informed consent.[49] In *Korman v. Mallin,* we established that in order to comply with Alaska's informed consent statute, AS 09.55.556,

> a physician must disclose those risks and benefits of a proposed procedure which a reasonable patient would need to know in order to make an informed and intelligent decision.[50]

We also held that materiality "must ultimately be judged by asking what a reasonable patient would want to know." [51] This standard requires the factfinder to determine "the existence and nature of the risk and the likelihood of its occurrence," and "whether the probability of that type of harm is a risk which a reasonable patient would consider in deciding on a treatment." [52]

Here, after extensive briefing by the parties, an unsuccessful petition for review by Marsingill, and objections by both sides, the trial court settled on informed consent instructions that described Marsingill's claim

as one alleging that she was harmed because Dr. O'Malley had failed to communicate "material information" about the potential seriousness of her condition and the risks of failing to seek immediate treatment, thus leaving her with insufficient information to make an informed decision as to whether she needed to report to the emergency room.

The instructions went on to state that a physician owes a duty to disclose information that would be material to a reasonable patient's informed and intelligent decisions regarding treatment and health, and that the sufficiency of a physician's disclosure is measured from the standpoint of a reasonable patient. They also specified that "[m]aterial information is information which the surgeon knows or should know would be regarded as significant by a reasonable person in the patient's position when deciding to accept or reject medical treatment." Furthermore, the instructions told the jury that failure to disclose material information "renders the physician liable for any injury a cause of which was the patient's declining to accept treatment if a reasonable person in the patient's position would not have declined treatment if the material information had been given."

The instructions laid out the ultimate jury decision as follows:

> If you decide that it is more likely true than not true that (1) James O'Malley failed to disclose to Vicki Marsingill, or a family member, material information necessary to permit a reasonable person to make an informed decision as to whether she should go to the emergency room on February 14, 1995, (2) a reasonable person, had she known this information, would have gone to the emergency room, and (3)

---

expert witness. You need not believe an expert even if the testimony is uncontradicted. However, you should act reasonably in deciding whether or not you believe an expert witness and how much weight to give expert testimony.

**49.** Our review of this claim is governed by *Lynden Inc. v. Walker,* 30 P.3d 609, 612 (Alaska 2001) ("A legally erroneous instruction will lead to reversal only where it prejudices a party."); *cf. Wilson v. State,* 967 P.2d 98, 102–03 (Alaska App.1998) (observing that the test for determin-

ing the legitimacy of jury instructions is not whether a "clearer and [a] more accurate statement of the law" is possible but rather whether "the trial judge's wording wrongly stated the law or was otherwise likely to have led the jury astray.").

**50.** 858 P.2d 1145, 1146 (Alaska 1993).

**51.** *Marsingill I,* 58 P.3d at 504.

**52.** *Id.* (quoting *Korman,* 858 P.2d at 1149).

the failure of Vicki Marsingill to go to the emergency room was a legal cause of her injuries, then you must return a verdict for the plaintiff, otherwise you must return a verdict for the defendant.

Although the standard established in *Marsingill I* and *Korman*[53] might have been described in many alternative ways, these instructions accurately stated the law. They informed the jury that Dr. O'Malley had a duty to disclose information that would be material to a reasonable patient. They defined "material information" as "information which the surgeon knows or should know would be regarded as significant by a reasonable person in the patient's position." And they emphasized that if information would lead a reasonable patient to accept treatment, the information needed to be disclosed. Nothing more is required.

Relying on the instructions' failure to specify that Dr. O'Malley was required to give her "all" material information, Marsingill argues that they allowed the doctor to argue that because he gave Marsingill *some* information, he satisfied his duty despite failing to disclose *all* material information. Marsingill insists that by merely requiring the doctor to disclose "material information," the court effectively allowed the defense to "nullify the standard altogether." Under the facts presented here, we find this argument unpersuasive.

Initially, Marsingill's argument incorrectly assumes that omitting an express requirement to disclose "all" material information equates to telling the jury that Dr. O'Malley only had to disclose "some" material information. Even if this assumption might be plausible in some situations, it lacks plausibility

here, for it overlooks the instruction that defined "material information" to include any information that a reasonable patient would regard as significant. Reading the instructions as a whole, then, it seems unlikely that a reasonable juror would have concluded that Dr. O'Malley met his duty to disclose "material information" despite neglecting to disclose matters that Marsingill would have deemed to be significant.

Moreover, the record undercuts Marsingill's assertion that the instructions allowed Dr. O'Malley to argue this improper interpretation. Our review of the record establishes that Dr. O'Malley's attorney never advanced this argument to the jury. Dr. O'Malley's attorney maintained that Dr. O'Malley was correct in not telling Marsingill that she might have a bowel obstruction and that this condition could be life threatening, because such a warning was "not even information ... much less material information.... [G]uesses are not material information."

In short, because the jury instructions correctly stated the law and because Dr. O'Malley's attorney did not argue that Dr. O'Malley was only required to disclose "some" of the material information, we find no error in the challenged instructions.

### D. Attorney's Fees

Marsingill's final point on appeal is that the trial court's award of attorney's fees was an abuse of discretion. After the verdict, Dr. O'Malley moved for attorney's fees. Dr. O'Malley noted that after the first trial he had been awarded $51,160.50 in attorney's fees. He stated that in the second trial he had incurred attorney's fees of $150,648.00.

---

**53.** Compare the statement of the standard in Alaska Civil Pattern Jury Instruction 8.03 (rev. 2002):

> In order for the plaintiff to prevail on [a failure to obtain informed consent] claim, you must find it is more likely true than not true that: (1) the defendant failed to provide enough information about the material risks of the [insert treatment or procedure], the likelihood that the risks would occur, and the reasonable alternatives to [insert type of treatment or procedure] to allow a reasonable person in the plaintiff's position to make an informed and intelligent decision whether or not to proceed

with the [insert type of treatment or procedure];
> (2) the plaintiff would have decided against the [insert type of treatment or procedure] if [he][she] had been provided such information; and
> (3) the [insert type of treatment or procedure] was a legal cause of the plaintiff's harm.

Alaska Civil Pattern Jury Instruction 8.05 (rev. 2002) specifies that "[a] risk is material if a reasonable person in the patient's position would have attached significance to the risk in deciding on treatment."

Under Civil Rule 82(b)(2), he calculated that he should get $45,194.42 in attorney's fees for the second trial.[54] He added the awards from both trials together for a total of $96,354.92. Over Marsingill's objection, the trial court awarded Dr. O'Malley the exact amount of attorney's fees he sought: $96,354.92. The court did not explain its award.

Marsingill argues that the fee award was too high. She contends that Dr. O'Malley's billing statement included non-compensable work, such as lobbying the legislature for a statutory reversal of *Marsingill I,* and appellate work relating to *Marsingill I.* She also argues that Dr. O'Malley's attorneys billed unreasonably high hours for some of their work. Finally, Marsingill contends that the trial court's award of fees for time spent on the appeal of *Marsingill I* conflicts with this court's order granting Marsingill fees and costs for the prior appeal.

Dr. O'Malley responds that the fee award was appropriate and that so long as a trial court did not depart from the fee schedule in Rule 82(b)(2), it did not need to explain its decision. He also notes that we have previously given trial courts great discretion in determining whether the amount of hours billed is reasonable and appropriate.

We have held that when a trial court issues a fee award that accords with the presumptive percentages in Rule 82(b)(2), the court need not offer an explanation of its award.[55]

We have also held that "it is … for the trial judge to determine whether too much time was spent by attorneys for the prevailing party or whether too many attorneys were employed." [56] Here, as to a $10,172.25 portion of Dr. O'Malley's total billings of $150,648, Marsingill simply advances a general claim of excessive billing. We find no merit to this claim. The general reasonableness of the billings was a matter within the discretion of the trial court.

 In contrast, we agree with Marsingill that it was error to award attorney's fees for legislative work and for work related to the first appeal. We have previously held that attorney's fees under Civil Rule 82 may be awarded only for work that is reasonably related to the matter directly before the trial court.[57] In *Torrey v. Hamilton,* we held that Rule 82 fees "must relate solely to attorney's services performed in the case in which the judgment is entered" and that the rule "only provides compensation for attorney's services performed up to the time of the judgment." [58] We have also held that attorney's fees for appeals are not awardable by the trial court or governed by Civil Rule 82, but may ordinarily be awarded by an appellate court acting in accordance with Appellate Rule 508.[59]

Here, Dr. O'Malley's billings appear to have included specific amounts attributable to appellate work and lobbying efforts before the legislature.[60] The superior court failed

**54.** Alaska Civil Rule 82(b)(2) states:

In cases in which the prevailing party recovers no money judgment, the court shall award the prevailing party in a case which goes to trial 30 percent of the prevailing party's reasonable actual attorney's fees which were necessarily incurred…. The actual fees shall include fees for legal work customarily performed by an attorney but which was delegated to and performed by an investigator, paralegal or law clerk.

**55.** *Nichols v. State Farm Fire & Cas. Co.,* 6 P.3d 300, 305 (Alaska 2000).

**56.** *Integrated Res. Equity Corp. v. Fairbanks N. Star Borough,* 799 P.2d 295, 304 (Alaska 1990).

**57.** *Torrey v. Hamilton,* 872 P.2d 186 (Alaska 1994); *Aloha Lumber Corp. v. University of Alaska,* 994 P.2d 991, 1003 (Alaska 1999) ("[T]he superior court had discretion to award [the pre-

vailing party] fees for services in addition to those provided exclusively in the superior court, but only if they closely related to and were made necessary by the superior court proceeding.").

**58.** *Torrey,* 872 P.2d at 187.

**59.** *See, e.g., Aloha Lumber,* 994 P.2d at 1003; *Stalnaker v. Williams,* 960 P.2d 590, 597 (Alaska 1998).

**60.** The appellate billings include work on the petition for rehearing and opposing the appellate cost bill. Apparent lobbying efforts include such items as: "Prepared letter re Marsingill opinion to Jordan of State Medical Association in response to request re legislative change"; "Email from Holmes re changing statute to eliminate telephone [sic] advice problem"; "Review proposed statute and sent email to Jordan and Holmes re same and protection for doctors" among others.

to address these parts of the billings or to explain why it found them to be compensable. Because these aspects of the award turn on an incorrect interpretation of the applicable legal rule rather than an exercise of allowable discretion, we vacate the award of attorney's fees and remand for reconsideration by the trial court.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the jury's verdict in favor of Dr. O'Malley but VACATE and REMAND the award of attorney's fees so that the trial court can reconsider the amount of the award in light of this opinion.

EASTAUGH, Justice, not participating.