Carol EGNER, f/k/a Carol Burns, and f/k/a Carol Church, a shareholder in Talbot's, Inc., Appellant,

v.

TALBOT'S, INC., an Alaska corporation; Jeffrey P. McNulty, president of Talbot's, Inc.; Nancy J. McNulty, director of Talbot's, Inc.; Jane T. Church; and Janet Minnich f/k/a Janet Church, Appellees.

No. S–12714.

Supreme Court of Alaska.

July 31, 2009.

---

Paul D. Kelly, Kelly & Patterson, Anchorage, and Steven W. Edmiston, Invicta Law Group, PLLC, Seattle, Washington, for Appellant.

Daniel Bruce and Alexander J. Hildebrand, Baxter Bruce & Sullivan P.C., Juneau, for Appellee.

Before: FABE, Chief Justice,
MATTHEWS, EASTAUGH, CARPENETI,
and WINFREE, Justices.

## OPINION

EASTAUGH, Justice.

## I. INTRODUCTION

Alleging denial of her rights as a shareholder and asserting other claims concerning ownership of Talbot's, Inc., Carol Egner sued Talbot's, Inc., her mother, her sisters, and a brother-in-law in 2006. The defendants moved for summary judgment, arguing that Carol had never been a shareholder and, alternatively, that the contract statute of limitations barred her claims. The superior court granted complete summary judgment to the defendants on the statute of limitations issue.

We affirm. We hold that Carol was on inquiry notice no later than 1986 that her status as a shareholder was disputed. We also hold that her failure to make reasonable inquiry within the applicable statutes of limitations precludes all claims related to her purported shareholder status.

## II. FACTS AND PROCEEDINGS

This case concerns claims relating to the ownership of Talbot's, Inc., a corporation that owns Talbot's, a general hardware and lumber store in Ketchikan.[1] In 2006 Carol

---

1. Because this case was resolved on summary judgment, the superior court did not make factual findings. Our fact description relies on the superior court record, including exhibits, affidavits of parties and other witnesses, and party depositions taken after Carol filed her complaint. In describing the facts, we take reasonable factual inferences in favor of the nonmovant. *John's*

*Heating Serv. v. Lamb*, 46 P.3d 1024, 1030 (Alaska 2002). We are not finding facts or resolving factual disputes.

The case caption on Carol's complaint describes her as "a shareholder in Talbot's Inc." Our use of that caption does not imply any conclusion by us that she is in fact a shareholder.

(Church) Egner sued the corporation, Jane Church, Nancy McNulty, Janet Minnich, and Jeffrey McNulty; her complaint alleged that she was a shareholder of Talbot's and that the defendants had violated various duties allegedly owed to Carol. Carol is the daughter of Jane Church and the late James Church Sr.; Carol is the sister of Janet (Church) Minnich and Nancy (Church) McNulty and the sister-in-law of Jeffrey McNulty. We refer collectively to the parties Carol sued as "the defendants." We refer interchangeably to Talbot's and Talbot's, Inc.

In 1949 Jane Church's parents sold all three hundred issued shares in Talbot's, Inc. to Jane and her husband, James Church Sr. James Church Sr. received 153 shares; Jane received 147. Jane and James Sr. were the directors and officers of Talbot's, Inc. from 1949 to 1978. During this period James Sr. managed the business and handled all corporate matters, except those requiring Jane's signature.

Jane and James Sr. had four children: Janet, Nancy, Carol, and James Jr. All four children intermittently worked at Talbot's between 1958 and 1978. Carol stated in an affidavit that she began working at Talbot's in 1960 and that 1964 was her first year of recorded earnings at the store.

Carol also stated in affidavits that her father, James Sr., frequently told her that she owned stock in Talbot's; that on at least six occasions before 1978 she was offered the option of a wage increase or stock and that she chose the stock; and that on at least three occasions (the last of which was in 1968), James Sr. showed her a stock ledger that indicated that she owned shares of Talbot's stock. The original stock ledger is not in the record; it was destroyed in a fire sometime before 1978.

James Jr. stated in an affidavit that he also had accepted offers from James Sr. to take Talbot's stock in lieu of wage increases during the same time period.

Janet, Carol's oldest sibling, testified in her deposition that she worked full-or part-time at Talbot's from 1958 through 1984, with the exception of three gaps, one from late 1965 though early 1968, and two in the early 1970s. Janet's responsibilities included daily bookkeeping, making bank deposits, and placing orders for the store. She assumed a managerial role after James Sr.'s death in 1978. Janet testified that she believed her parents owned Talbot's in its entirety, that she was never aware of any transfer of shares or offer of stock to any of her siblings, and that any transfer or offer would have been discussed by the entire family.

When James Sr. died in 1978, his wife, Jane, inherited his shares. Jane testified at her deposition that she was the sole shareholder of Talbot's after James Sr.'s death. Carol stated in an affidavit that she had asked Jane for Carol's stock certificates after James Sr.'s death, and that Jane had responded by saying both that Carol "did not own any Talbot's stock," and that Jane and Janet were "taking care of things" and that "it took time."

The stock ledger produced in discovery after Carol sued in 2006 had been generated in 1979, after James Sr.'s death. Jeffrey McNulty, Nancy's husband, testified in his deposition that because the defendants could not find a stock transfer ledger for the 1949–1979 period, the share certificates and stock transfer ledger were recreated with entries dating from 1975 on, based on James Sr.'s 1975 tax information. These reconstituted records appear to support the defendants' contentions that Jane already owned 147 shares before James Sr.'s death, that she inherited his 153 shares when he died, and that she was therefore the only shareholder as of 1979.

Three share certificates, created in 1979 but backdated to 1975, were for 153, 147, and 300 shares, respectively. The defendants contend on appeal that there were only 300 shares total, not 600 as the certificates imply. They contend that the third certificate, for 300 shares, was erroneously backdated; it should have been dated January 1979 and was intended to reflect Jane's ownership of the total of all 300 shares evidenced by the first two certificates after her husband's shares were transferred to her following his death in 1978. The third certificate potentially supports Carol's contention that there

were more than 300 shares, and that she owned some of them even if Jane owned 300 after James Sr. died.

In March 1980 Jane, Janet, Nancy, and Carol entered into a five-year voting trust agreement by which the three sisters were to vote Jane's shares. This agreement gave each sister a one-third interest in the shares, including the rights to vote and manage those shares, but not the right to collect dividends. The agreement stated that Jane was the "party of the first part" and that the "first party" owned all of the shares of Talbot's. As part of this agreement, Carol, Nancy, and Janet were collectively issued one 300–share certificate dated March 7, 1980. Carol later asserted in an affidavit that she first learned in 2006 (when she received defendants' motion for summary judgment), that this 300–share certificate had been issued.

In November 1980 the then-board (Jane, Janet, Nancy, and Carol) met and determined that the voting trust agreement was not working and agreed that Jane and Janet would manage Talbot's until "other arrangements" could be made. Carol signed the minutes of that meeting. Janet and Nancy signed the back of the March 7, 1980 share certificate in order to transfer the 300 shares back to Jane, but Carol did not sign. Carol later stated in an affidavit (filed in response to the defendants' summary judgment motion) that she was not advised of what "other arrangements" would be made, and that she did not sign and would not have signed a document dissolving the voting trust agreement if she suspected that it would terminate her interest in Talbot's. By its own terms, the voting trust agreement expired five years after it was executed in 1980.

In a series of transactions between 1983 and 1986, Jane sold her shares in Talbot's to Nancy and Nancy's husband, Jeffrey McNulty. Carol stated in paragraph 23 of her August 10, 2006 affidavit, filed in response to defendants' statute of limitations summary judgment motion, that she "did not find out that in 1983 my mother sold Talbot's to Nancy and Peter McNulty until 1986."

In July 1995 Jane and Janet visited Carol at her home and asked her to sign a document. The parties disagree about what the document was. Carol stated in an affidavit that the document was a stock certificate made out to Carol Burns (Carol's former name) and that it represented that she owned at least 100 shares of Talbot's stock. She also stated that Jane and Janet asked her to sign the back of the document for tax purposes and that, when Carol asked to see the certificate, they refused to give it to her and physically prevented her from taking it.

The individual defendants stated in affidavits that the document was the stock certificate relating to the voting trust agreement. The certificate transferred the 300 shares back to Jane. Nancy testified in her deposition that she asked Jane and Janet to ask Carol to sign the certificate. Although Nancy also testified that, after consulting with the corporation's attorneys, she and Jeffrey had concluded that Carol's signature was unnecessary, Nancy stated in an affidavit that she wanted Carol to sign to "cur[e] any perceived problems" with the certificate.

In November 2005 Carol wrote to Nancy to request a list of shareholders for Talbot's and any stock certificates issued to Carol. Jane responded by letter to Carol's request, stating that Carol had never owned any shares of Talbot's. In February 2006 Carol's attorney made a written request on Carol's behalf to review the corporate records and documents for Talbot's. An attorney for Talbot's responded, denying Carol's request on the ground Carol was not a shareholder.

In May 2006 Carol sued Talbot's, her mother, her sisters, and her brother-in-law. Her complaint asserted claims for: (1) failure to allow full inspection of corporate books and records;[2] (2) failure to allow Carol to exercise various other shareholder rights under the Alaska corporations code;[3] (3)

---

**2.** AS 10.06.430.

**3.** Carol's complaint alleged violation of these other statutory rights: (a) the right to inspect bylaws and amendments, per AS 10.06.233; (b)

the right to notice of shareholders' meetings, per AS 10.06.410; (c) the right to view a shareholder list, per AS 10.06.413; (d) the right to receive an annual report, per AS 10.06.433(a); (e) the right to receive a response to a written request for

breach of fiduciary duty; (4) conversion and misappropriation of corporate funds; and (5) conversion of and trespass to Carol's shares.

The defendants moved for summary judgment, arguing that Carol's claims should be dismissed either because they were barred by the six-year contract statute of limitations or because Carol was not a shareholder.[4] The superior court denied summary judgment as to whether Carol was a shareholder, holding that there were genuine issues of material fact as to that issue. It nonetheless granted complete summary judgment for the defendants, holding that the pertinent statutes of limitations barred all of Carol's claims. It therefore entered judgment against Carol.

Carol appeals, arguing that the superior court erred in granting summary judgment on the statute of limitations issue. She asks us to remand for an evidentiary hearing.

## III. DISCUSSION

### A. Standard of Review

■ We review summary judgment decisions de novo, affirming if there are no genuine issues of material fact and the prevailing party is entitled to judgment as a

matter of law.[5] In reviewing the grant of summary judgment, we view the facts in the light most favorable to the party against whom summary judgment was entered.[6] We have held that "[t]he evidentiary threshold to preclude the entry of summary judgment is low." [7]

■ Under the discovery rule, the date on which the statute of limitations begins to run is a question of fact.[8] But it is a legal question whether undisputed facts establish that a plaintiff is on inquiry notice.[9] Whether a claim is actually barred by the statute of limitations is a question of law.[10] We review questions of law de novo, adopting the rule that best reflects precedent, reason, and policy.[11]

### B. Whether Carol Was Put on Inquiry Notice at Least Six Years Before She Sued in 2006 that Her Shareholder Status Was Disputed

The superior court held that the defendants presented sufficient evidence to make out a prima facie case that Carol was on inquiry notice as of 1986 at the latest, and that Carol failed to demonstrate that there

accounting records, per AS 10.06.433(d) & (e); and (f) the right to notice and shareholder approval before the sale of corporate assets not in the regular course of business, per AS 10.06.568, .570(a)-(b).

4. The defendants' motion also argued that the statute of frauds barred Carol's claims. The superior court denied summary judgment as to that argument, and no party appeals that ruling.

5. *Preblich v. Zorea*, 996 P.2d 730, 733 (Alaska 2000) (affirming grant of summary judgment because six-year statute of limitations was triggered when client had sufficient information to know former attorney might have engaged in malpractice).

6. *Brannon v. Cont'l Cas. Co.*, 137 P.3d 280, 284 (Alaska 2006) (holding that, in suit for breach of duty to defend, limitations period is equitably tolled until underlying action is terminated due to final judgment).

7. *John's Heating Serv. v. Lamb*, 46 P.3d 1024, 1032 (Alaska 2002) (citing *Meyer v. State, Dep't of Revenue, Child Support Enforcement Div., ex rel. N.G.T.*, 994 P.2d 365, 368 (Alaska 1999)) (holding that homeowners who sued heating service company for alleged negligent failure to repair

furnace or warn of its dangerous condition presented sufficient evidence regarding date of discovery of defective condition to overcome summary judgment); *see also Meyer*, 994 P.2d at 368 (holding that putative father's affidavit stating he did not have sexual intercourse with plaintiff in paternity suit within possible period of conception was sufficient to preclude summary judgment despite genetic testing indicating 99.98% chance that he was biological father of child).

8. *Catholic Bishop of N. Alaska v. Does 1–6*, 141 P.3d 719, 725 (Alaska 2006) (stating that determining when statute of limitations begins to run is question of fact that precludes superior court from granting motion to dismiss but noting that "once sufficient discovery is conducted, the statute of limitations affirmative defense should be resolved in advance of trial").

9. *Mine Safety Appliances Co. v. Stiles*, 756 P.2d 288, 292 (Alaska 1988).

10. *Brannon*, 137 P.3d at 284.

11. *Law Offices of Steven D. Smith, P.C. v. Borg–Warner Sec. Corp.*, 993 P.2d 436, 443 (Alaska 1999).

was a genuine dispute of material fact. The court wrote:

> [A]ny causes of action concerning her [shareholder] status in Talbot's, Inc. accrued in 1978. By that time she had discovered, or reasonably should have discovered, the existence of all elements essential to any such cause(s) of action. At the latest, any such cause(s) of action accrued in 1986 when she also knew that Ms. Church had sold her stock to ... Ms. McNulty and Mr. McNulty, that they claimed that Ms. McNulty and Mr. McNulty were the sole owners of Talbot's, Inc., and that Ms. McNulty had excluded her from the business premises. There are no genuine issues of material fact in this regard.

(Footnote omitted.) The superior court therefore held that the defendants were entitled to judgment as a matter of law on the statute of limitations issue and entered complete summary judgment for the defendants.

Carol argues that it was error to grant summary judgment on the statute of limitations issue. She contends that when the statute of limitations began running is a question of fact that should not be resolved on summary judgment.

Carol filed her complaint in May 2006. The longest potentially applicable statute of limitations was the six-year statute for contract causes of action accruing before August 7, 1997.[12] The essential question here is therefore whether Carol was put on notice before May 2000 that she should begin an inquiry to protect her rights.

When a cause of action accrues ordinarily presents a question of fact [13] that must be resolved at an evidentiary hearing.[14] Resolution of the issue on summary judgment is appropriate only if the superior court has before it uncontroverted facts regarding when the statute of limitations began running.[15] We apply the discovery rule to determine when a cause of action accrues if an element of the cause of action is not immediately apparent.[16] Under the discovery rule, a cause of action accrues "when a reasonable person has enough information to alert that person that he or she has a potential cause of action or should begin an inquiry to protect his or her rights."[17] The question here is therefore whether Carol was put on inquiry notice before May 2000.

A party moving for summary judgment "bears the initial burden of proving through admissible evidence (1) the absence of genuine fact disputes, and (2) its entitlement to judgment as a matter of law."[18]

Here the defendants filed exhibits with their summary judgment motion. The exhibits included James Sr.'s will and related documents and the 1980 voting trust agreement and related documents. The voting trust agreement stated that "the first party ... owns all of the shares of Talbot's, Inc." and described Jane Church as the "party of

**12.** Former AS 09.10.050; ch. 26, §§ 3, 55, SLA 1997.

**13.** *Domke v. Alyeska Pipeline Serv. Co.*, 137 P.3d 295, 303 n. 19 (Alaska 2006) (noting that statute of limitations issues generally must be resolved pre-trial by the superior court acting as factfinder, not as a matter of law); *Williams v. Williams*, 129 P.3d 428, 431 (Alaska 2006) (concluding that superior court's decision to hold evidentiary hearing on statute of limitations issue was proper because there was genuine issue of material fact); *Palmer v. Borg–Warner Corp.*, 818 P.2d 632, 634 (Alaska 1990) (stating that summary judgment is ordinarily inappropriate means of adjudicating statute of limitations issues, but holding that it was proper in this case because facts were truly uncontroverted).

**14.** *Williams*, 129 P.3d at 430; *Pedersen v. Zielski*, 822 P.2d 903, 907–08 (Alaska 1991) (holding that evidentiary hearing was necessary to resolve statute of limitations issue because there were genuine issues of material fact).

**15.** *John's Heating Serv. v. Lamb*, 46 P.3d 1024, 1033 (Alaska 2002); *Mine Safety Appliances Co. v. Stiles*, 756 P.2d 288, 292 (Alaska 1988).

**16.** *John's Heating Serv.*, 46 P.3d at 1031.

**17.** *Id.* (citing *Mine Safety*, 756 P.2d at 291); *see also Roach v. Caudle*, 954 P.2d 1039, 1041 (Alaska 1998) ("Under the discovery rule a cause of action accrues 'when a person discovers, or reasonably should have discovered, the existence of all elements essential to the cause of action.'" (quoting *Cameron v. State*, 822 P.2d 1362, 1366 (Alaska 1991))).

**18.** *Alakayak v. British Columbia Packers, Ltd.*, 48 P.3d 432, 447–48 (Alaska 2002).

the first part." Carol signed that agreement in 1980. Each of the four individual defendants also filed affidavits. They collectively asserted that Jane owned 100% of the shares and sold them in 1983 to Nancy and Jeffrey McNulty. The exhibits and affidavits made out a prima facie showing that Carol was not a shareholder and had never been a shareholder and that the store (or perhaps the corporation) was sold to Nancy and Jeffrey McNulty in 1983. They also potentially established that Carol, having signed the voting trust agreement in 1980, was on notice as of 1980 that she owned no shares in the corporation. On the timeliness issue, defendants asserted generally that all of Carol's claims accrued long before (and certainly more than six years before) she filed suit in 2006.

 Once the movant has made out a prima facie case, the nonmovant, to avoid summary judgment, must set forth specific facts showing that there is a genuine dispute of material fact.[19] The evidence adduced by the defendants in moving for summary judgment obliged Carol to demonstrate that there was a genuine dispute of material fact about (1) whether she was a shareholder and (2) whether, even after she signed the 1980 agreement, she was unaware that her shareholder status was disputed.

As to the first issue, she succeeded: the superior court denied summary judgment to the defendants on the issue whether Carol was a shareholder. This issue is not before us on appeal, so we assume that the superior court correctly held that there was a genuine factual dispute about whether Carol was a shareholder.

As to the second issue, we conclude that it is controlled by the 1980 voting trust agreement Carol signed and the admissions made in her August 10, 2006 affidavit opposing summary judgment on the timeliness issue.

In paragraph 12 of that affidavit, Carol stated that, after James Sr.'s death in February 1978, Jane "told me that I did not own any Talbot's stock." This averment was an admission by Carol that in 1978, Jane had explicitly told her that Carol was not a shareholder and had thus explicitly repudiated

Carol's alleged status as a shareholder. Jane was then a director, officer, and the sole or majority shareholder of Talbot's.

The voting trust agreement described Jane as the "party of the first part" and stated that the "first party" owned all of the shares of Talbot's. Carol signed that agreement in March 1980. The agreement undisputably put her on notice that Jane was the sole shareholder of Talbot's.

Paragraph 23 of Carol's affidavit describes what Carol claims she knew about the sale of Talbot's to the McNultys and also describes her December 1986 confrontation with Nancy at the store:

> *I did not find out that in 1983 my mother sold Talbot's to Nancy and [Jeffrey] McNulty until 1986.* Sometime before Christmas in 1986 I went to the Talbot's store to invite Nancy and [Jeffrey] McNulty to a Christmas open house I was holding. At that time I believed they were merely managing the Talbot's store. During that meeting Nancy took me into the Talbot's office and told me to get out of her store and never to come around again.

(Emphasis added.) As to whether Carol was aware that there was a dispute about whether she was a shareholder, the emphasized sentence contains Carol's admission that she became aware in 1986 that Jane had sold Talbot's to Nancy and Jeffrey in 1983. Carol also stated in another affidavit that "in the spring or early summer of 1980" Jane told Carol that Nancy might purchase Talbot's, and that Carol told Jane that Carol "was delighted at the news because I would then get my Talbot's shares." By 1986 Carol was aware both that the sale had occurred and that she had not received any Talbot's shares after the sale. That awareness, coupled with what Carol admitted Jane told her in 1978 and with the terms of the voting trust agreement Carol signed in 1980, put her on notice that the corporation did not consider her a shareholder and was not treating her as a shareholder.

Nancy's demand that Carol "get out of her store and never ... come around again" read in isolation might permit an inference that

---

19. *Id.* at 448.

Nancy was speaking colloquially, not possessively, about "her store," even though the first sentence of paragraph 23 seems to preclude any such inference. But even if the December 1986 confrontation did not put Carol on notice that Talbot's was actually Nancy's, the first sentence in paragraph 23 of Carol's affidavit established that Carol actually knew in 1986 that Carol was not an owner of Talbot's. That sentence was an admission establishing that, as of 1986, Carol had actual knowledge of facts putting her on notice that she needed to make inquiry to protect whatever shareholder rights she thought she had in Talbot's.

Summary judgment was a permissible method for disposing of claims relating to conduct that occurred within the applicable limitations periods after Carol was put on inquiry notice no later than 1986.[20] We held in *Mine Safety Appliances Co. v. Stiles* that although summary judgment is ordinarily an inappropriate mechanism for determining whether the statute of limitations has run, in cases in which there are uncontroverted facts that determine whether a party reasonably should have begun an inquiry to protect his or her rights, the court may make the determination as a matter of law.[21]

The uncontroverted facts establish that Carol was put on inquiry notice no later than 1986. She knew that Talbot's had been sold, that she was not considered an owner of Talbot's, that her shareholder status was denied or disputed, that she might have a cause of action, and that she should begin an inquiry to protect her rights.[22]

20. *See Mine Safety,* 756 P.2d at 292.

21. *Mine Safety Appliances Co. v. Stiles,* 756 P.2d 288, 292 (Alaska 1988) (citing *Russell v. Municipality of Anchorage,* 743 P.2d 372, 375–76 & n. 11 (Alaska 1987)).

22. *Cf. id.* ("It is uncontroverted that Stiles knew he was hit in the head while wearing a safety helmet designed to protect against such blows. The helmet cracked and the suspension clips broke upon impact. Parker investigated the accident and the result of that investigation was available to Stiles shortly after the accident. In addition, Parker's safety officer kept the helmet for two years where it was available for inspection. These facts were available to Stiles the day of the accident.").

Because any applicable statute of limitations first began running no later than 1986, the longest conceivably applicable statute of limitations has long since expired.[23] Our conclusion that the cumulative effect of the 1978, 1980, and 1986 events placed Carol on inquiry notice makes it unnecessary for us to consider whether those events were independently sufficient to place her on inquiry notice.

Carol argues that she was a director of Talbot's and that the bylaws require that each director own one share of stock, that she received mixed messages from Jane after James Sr.'s death in 1978, and that the 1980 voting trust agreement was ambiguous.[24] She appears to contend that her status as a director, the mixed messages, and the alleged ambiguity create a genuine issue of material fact about whether she was on inquiry notice. As the superior court concluded, Carol's assertions may preclude summary judgment on the issue whether she was in fact a shareholder. But the relevant terms of the voting trust agreement are not ambiguous. They and her admission that she knew in 1986 that Jane had sold Talbot's to Nancy in 1983, taken with Jane's 1978 statement that Carol had no stock, require a conclusion that Carol had a duty to inquire. The presence of a genuine fact dispute about Carol's shareholder status does not create a genuine fact dispute about whether Carol knew enough to put her on inquiry notice, and thus did not excuse her from making a reasonable inquiry to protect her rights.

23. Six years is the longest limitations period potentially applicable to Carol's claims. Former AS 09.10.050, *amended by* ch. 26, §§ 3, 55, SLA 1997. Statutory, tort, and contract claims are subject to one-, two-, three-, or six-year statutes of limitations. AS 09.10.053, .070, .090; former AS 09.10.050, *amended by* ch. 26, §§ 3, 55, SLA 1997.

24. We noted above that Jane told Carol both that she owned no Talbot's stock and that Jane and Janet were "taking care of things" and that "it took time." We conclude that the relevant terms of the voting trust agreement are not ambiguous.

Carol argues that she had a lesser burden to conduct an inquiry to protect her rights, because as a shareholder, she was owed fiduciary duties. We have never adopted that rule, although other jurisdictions have.[25]

We do not need to decide here whether to adopt such a rule, because Carol was put on inquiry notice no later than 1986, even assuming a fiduciary relationship between the parties were deemed to have lessened Carol's duty of inquiry. Her actual knowledge as of December 1986 was completely inconsistent with a belief that she was a shareholder or that the corporation considered her a shareholder.

Moreover, there is no indication that the defendants concealed the true state of corporate ownership from her, that the 1986 events were equivocal, or that Carol relied on any fiduciary relationship when she failed to make any inquiry.

■■■ Whether in a given dispute a reasonable inquiry would have been productive potentially raises a question of fact.[26] But there is no indication an inquiry would have been unproductive here, and Carol asserts only that she was not on inquiry notice, not that inquiry would have been unsuccessful or futile. A reasonable inquiry would have confirmed one of these alternative scenarios: (1) Carol was not a shareholder, (2) she was a shareholder, or (3) there was a dispute about whether she was a shareholder. In holding that Carol was on inquiry notice no later than 1986 and in barring her claims, the superior court necessarily determined that, had Carol reasonably inquired, the corporation would have denied that she was a shareholder.[27] Uncontroverted facts support that proposition. Given the contemporaneous evidence of the 1978 and 1986 events and the terms of the 1980 agreement, and the defendants' sworn assertions that Carol was not and had never been a shareholder, there is no basis for thinking a timely inquiry would have led to a corporate response confirming that Carol was a shareholder. Carol is therefore deemed to have been on notice of all claims arising out of the denial a reasonable inquiry would have provoked. Summary judgment was the appropriate mecha-

**25.** *See Bacon v. Rives,* 106 U.S. 99, 107, 1 S.Ct. 3, 27 L.Ed. 69 (1882) (holding that statutes of limitations do not accrue against beneficiary of trust until beneficiary receives notice that trust is closed or that trustee has disavowed trust); *Bennett v. Hibernia Bank,* 47 Cal.2d 540, 305 P.2d 20, 32–33 (1956) (holding that "the statutory period does not commence to run until the stockholder has knowledge or notice that his rights are denied or that his status is repudiated or controverted by the corporation" because "where a fiduciary relationship exists, facts which would ordinarily require investigation may not excite suspicion"); *Maguire v. Hibernia Savings & Loan Soc'y,* 23 Cal.2d 719, 146 P.2d 673, 681 (1944) (holding that in fiduciary relationship statute of limitations does not begin to run until "stockholder has knowledge that his rights are denied or status controverted by the corporation"); *Schneider v. Union Oil Co.,* 6 Cal. App.3d 987, 994, 86 Cal.Rptr. 315 (1970) (holding that until shareholder has notice of "some unequivocal act that his rights were being disputed" he or she has "right to regard [the corporation] as holding her interest in the corporation in trust for her"); *Leek v. Alliance Fund, Inc.,* 15 Kan.App.2d 250, 806 P.2d 491, 494–95 (1991) (holding that cause of action to enforce distribution of corporate dividends payable on demand does not accrue until there has been demand and refusal); *Yeaman v. Galveston City Co.,* 106 Tex. 389, 167 S.W. 710, 723–24 (1914) (holding that in corporation-shareholder fiduciary relationship "statutes of limitation have no application until there is a clear and unequivocal disavowal of the trust," and shareholder receives notice of that disavowal).

**26.** *Pedersen v. Zielski,* 822 P.2d 903, 908 (Alaska 1991).

**27.** We have not yet determined who bears the burden of demonstrating the potential futility or productiveness of an inquiry that was not made. On summary judgment, once the moving party has made out a prima facie case that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law, the nonmoving party bears the burden of demonstrating the existence of a genuine issue of material fact. *Alakayak v. British Columbia Packers, Ltd.,* 48 P.3d 432, 447–48 (Alaska 2002); *see also John's Heating Serv. v. Lamb,* 46 P.3d 1024, 1033 n. 29 (Alaska 2002). But it is unclear, once a genuine issue of material fact has been shown, whether the plaintiff must demonstrate that a reasonable inquiry would have been futile, or whether the defendant must demonstrate that a reasonable inquiry would have been productive. In this case Carol offered no evidence that an inquiry would have been futile, and the defendants offered sufficient evidence that an inquiry would have been productive. It is therefore unnecessary to determine who bears the burden, because the result here would be the same under either standard.

nism for resolving the untimeliness of those claims.[28]

We conclude that Carol was put on inquiry notice no later than 1986 that her shareholder status was disputed. All of the potentially applicable statutes of limitations therefore bar any shareholder-related claims that Carol could have then brought (including those she brought in 2006 and those listed above in footnote four) after making inquiry. We therefore affirm the defendants' summary judgment as to all claims involving alleged conduct or losses that occurred during or before her 1986 store visit. We separately address any possible claims for post–1995 conduct or losses relating to her shareholder status.

## C. The Effect of the 1995 Events

We next consider whether the 1995 events had any bearing on the timeliness of any of Carol's claims. Carol contends that the 1995 events, which she characterizes as a meeting at which Jane and Janet asked her to sign a "stock certificate" in Carol's name, reconfirmed her status as a shareholder. The defendants dispute that characterization of the document, and alleged below that the certificate related to the voting trust agreement. They argue here that the only permissible inference is that the 1995 events were a repudiation, not a reconfirmation, of Carol's shareholder status.

■■■■ The continuing violations doctrine allows plaintiffs to rely on incidents occurring outside the statute of limitations period to establish ongoing tort or contract claims in some circumstances.[29] We have applied this doctrine in the context of shareholder rights actions.[30] Carol seems to argue that even if earlier events put her on inquiry notice, the 1995 events reconfirmed her status as a shareholder, permitting claims for continuing violations of her shareholder rights. If she were correct, at least some of her claims might not be time-barred.[31]

■■■■ The defendants argue that Carol cannot prevail on a continuing violations theory, because events that occurred outside the limitations period established a "permanent violation." We have explained that "[t]he 'permanent' violation triggers a reasonable person's awareness of the alleged discrimination and the need to assert her rights. On a subjective basis, if a plaintiff's actions show that she knew her rights had been violated by a certain point in time, the limitations period starts running from that date."[32] The presence of a permanent violation outside the limitations period forecloses a plaintiff from invoking the continuing violations doctrine to pursue claims for conduct within the limitations period. "The continuing violation doctrine does not exist to give a second chance to an employee who allowed a legitimate [discrimination] claim to lapse."[33]

■■■■ The superior court held here that because "[a] 'permanent violation' occurred on or before 1986," the continuing violations doctrine does not apply. Carol argues that it was error to so hold, because she asserts that a contention there was a permanent violation raises a factual question that must be resolved at an evidentiary hearing. Although the inquiry into whether a permanent violation has occurred is subjective and fact-intensive,[34] we have never held that it can never be resolved on summary judgment.

28. *Cf. Mine Safety,* 756 P.2d at 292.

29. *Reich v. Cominco Alaska, Inc.,* 56 P.3d 18, 25–26 (Alaska 2002); *Hanson v. Kake Tribal Corp.,* 939 P.2d 1320, 1323, 1325 (Alaska 1997).

30. *See Hanson,* 939 P.2d at 1325.

31. The applicable statutes of limitations bar any claims that accrued outside the limitations periods, working backwards from the date Carol filed suit. For example, tort claims accruing more than two years before she filed suit would be barred by the two-year statute of limitations. Because Carol sued in May 2006 and the longest limitations period potentially applicable to her claims is six years, all claims accruing before May 2000 would be time-barred.

32. *Sengupta v. University of Alaska,* 21 P.3d 1240, 1249 (Alaska 2001).

33. *Id.* at 1249 (quoting *Roberts v. Gadsden Mem'l Hosp.,* 835 F.2d 793, 800 (11th Cir.1988)).

34. *See id.; see also Berry v. Bd. of Supervisors of L.S.U.,* 715 F.2d 971, 981–82 (5th Cir.1983) ("[T]he particular context of individual employment situations requires a fact-specific inquiry by a trial judge which cannot be easily reduced to a formula.").

The same facts that require a conclusion that Carol was on inquiry notice no later than 1986 also require a conclusion that a permanent violation occurred no later than 1986. The 1978 and 1986 events and the 1980 agreement were collectively sufficient to "trigger[ ] a reasonable person's awareness of the alleged [wrongful conduct] and the need to assert her rights." [35] The allegedly wrongful conduct was the denial of Carol's claim that she was a shareholder. In effect, there was a denial of her alleged shareholder status. We assume for discussion's sake that some corporate conduct related to share ownership might not amount to a permanent violation. For example, non-permanent violations could account for a continuing failure to pay annual dividends owed a shareholder. In comparison, non-payment resulting from the claimant's removal from the shareholder rolls would arise out of a permanent change in the claimant's status. Because in that situation the continuing failure to pay a dividend would result from the permanent violation, the continuing violations doctrine would not allow the claimant to pursue untimely claims accruing out of the permanent violation.

In an analogous context, in considering the timeliness of employment claims, some courts look to whether the conduct within the statute of limitations period was "independently unlawful." In *National Railroad Passenger Corp. v. Morgan*,[36] the United States Supreme Court considered the claims of an employee who alleged discrete acts of discrimination both outside of and within the applicable statute of limitations periods.[37] The Court held that the continuing violations doctrine permitted background evidence about time-barred acts to support claims for discrete acts that occurred within the limitations period and that were "independently discriminatory." [38] But the Court also held that a time-barred act could not be used to

support a claim unless the act that occurred within the statutory period and that formed the basis for the claim was independently unlawful.[39] For example, in the employment context, a former employee may not introduce evidence of a time-barred wrongful termination claim to support a timely claim for denial of employment-dependent benefits, because it is not independently unlawful to deny employment-dependent benefits to a non-employee.[40]

We have not applied the Court's reasoning in *Morgan* to discrimination claims in an employment context. But such claims typically involve a continuing employment relationship.[41] Here Carol was on notice by 1986 that there was no continuing corporate-shareholder relationship. In this context it seems appropriate to consider whether the 1995 conduct was "independently unlawful."

It is not independently unlawful for a corporation to deny shareholder rights to non-shareholders. Proving a continuing violation of her shareholder rights would necessarily require Carol to prove that the defendants wrongfully (or erroneously) denied Carol's shareholder status, a claim for which the statute of limitations has long since expired. The denial that Carol was a shareholder was a permanent denial of Carol's claim to shareholder status. That denial precludes us from relying on evidence of Carol's shareholder status to support claims for alleged shareholder's rights denials occurring within the relevant statutory periods.

Likewise, the superior court did not err in concluding that a permanent violation occurred on or before 1986.

It does not matter that the superior court held that there was a genuine fact dispute about whether Carol was a shareholder. All of Carol's claims are time-barred because she was on notice of a permanent violation no later than 1986. The existence of a perma-

---

**35.** *Sengupta*, 21 P.3d at 1249.

**36.** *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).

**37.** *Id.* at 104–05, 122 S.Ct. 2061.

**38.** *Id.* at 113, 122 S.Ct. 2061.

**39.** *Id.*

**40.** *See id.* at 112–13, 122 S.Ct. 2061.

**41.** *Cf. Mahan v. Arctic Catering, Inc.*, 133 P.3d 655, 666–67 (Alaska 2006) (Fabe, C.J., dissenting).

nent violation means that Carol cannot recover on a continuing violations theory. The 1995 events do not give rise to any claims independent of those she would have learned of had she made timely inquiry after 1986, and do not involve "independently wrongful" conduct.[42] A reasonable and timely inquiry would have revealed the underlying basis for any claims relating to her shareholder status and the denial of rights she arguably would have had as a shareholder. This means that none of Carol's 2006 claims was timely. The superior court did not err in holding that all of Carol's claims are barred by the applicable statutes of limitations.

## IV. CONCLUSION

We AFFIRM the superior court's final judgment entered upon summary judgment for the defendants.

---

**42.** Carol argues that she has been a shareholder since her father first granted shares to her during the 1960s. She does not argue that she became a shareholder through any separate event occurring between 1986 and 1995. We therefore assume that she was not the beneficiary of any new devise or gift of shareholder rights between 1986 and 1995.